MARY FOSTER *v.* ROMAN CATHOLIC DIOCESE OF VERMONT.

(70 A2d 230)

Special Term at Rutland, November, 1949.

Present: SHERBURNE, C.J., JEFFORDS, CLEARY, ADAMS and BLACKMER, JJ.

Opinion filed January 3, 1950.

*Vernon J. Loveland* and *Donald H. Hackel* for the plaintiff.

*Ryan, Smith & Carbine* for the defendant.

ADAMS, J. This is an action of tort in which the plaintiff, Mary Foster, seeks to recover damages from the defendant, the Roman Catholic Diocese of Vermont, resulting from a fall on ice that occurred on December 12th, 1947.

The plaintiff alleges in substance :— That the defendant owns a church building and premises in the City of Rutland, known as St. Peter's Church; that it constructed and maintained on the premises a cement driveway with a cement gutter leading into it; that the driveway extended from the premises across a public side-

walk to a public street; that from time to time, when rain fell or snow melted, water from the roofs, gutter, driveway and adjacent area flowed down the driveway across the sidewalk into the street; that in freezing weather ice constantly formed in lumps and irregular ridges to a considerable depth on the sidewalk where the driveway crossed it to the danger and detriment of persons using it; that the defendant knew or should have known of such condition by reason of its long continued existence, accidents to pedestrians at the place, complaints made to it of such conditions and notices given to it thereof; that the defendant on the day in question carelessly and negligently permitted water to flow on and over the sidewalk and ice formed therefrom; that the plaintiff on that day while walking on the sidewalk and while in the exercise of due care slipped and fell on the ice sustaining personal injuries due to the negligence of the defendant and because of the construction and maintenance by it of a public nuisance.

The defendant filed an answer in two counts; the first of which neither admits nor denies the allegations in the plaintiff's declaration, but alleges, in substance, in defense that the defendant is a Vermont private corporation organized solely for charitable and religious purposes; that St. Peter's Church and the premises are used solely as a place of religious worship; that the plaintiff at the time in question was a member of that parish and was returning home after having participated in religious worship at the church and that the defendant used and exercised due care in the selection of its agents and servants for the construction, maintenance and care of the building and premises.

The plaintiff demurred to this count of the answer on the grounds that it and the matters contained therein are not sufficient in law to constitute a defense to the action. The demurrer was overruled, the answer adjudged sufficient, the plaintiff allowed exceptions and the court in its discretion passed the cause to this Court before final judgment for a determination of exceptions to the order overruling the demurrer.

The defendant may be classified as a privately conducted charitable institution. In fact it is conceded in the briefs and was in oral argument that the law pertaining to such institutions applies to the defendant.

From our study of the law and after reading many decisions

from other jurisdictions pertaining to the subject matter involved in this case, we are convinced that we should decide this case upon the broad question, namely:— Is or is not a privately conducted charitable institution liable for injury caused by negligence? We are satisfied if we should not do so, we would start this Court along a highway that would soon be shrouded in a fog of doubt from which it would be difficult to emerge into the sunlight of legal certainty.

The liability of private charities for injuries has never, to our knowledge, been passed upon by this Court and we have no statute in regard to it. Counsel concede that it is an open question in this state. This leaves us free to act without constraint of any rule of *stare decisis* and in accordance with what we deem to be the law.

The question presented is one of great interest and much has been written about it in recent years. It is one upon which there has been and is not only much conflict of decisions among the courts and among the members of the various courts, for many decisions have been far from unanimous, but there is great diversity of opinion among courts that reach the same ultimate decision, as to the correct reason, or ground for so deciding. Every reason advanced and ground used has been vulnerable to attack and criticism and there has been no lack of it. When we look to decisions in other jurisdictions for enlightenment we are confronted with an irreconcilable conflict of reasoning and result.

The court said in *Cohen* v. *General Hospital Society*, 113 Conn 188, 194, 154 A 435, 437:

> "Whether or not, and to what extent, a charitable corporation is liable in tort for its negligence, or that of its servants or agents, is a question that has been frequently before the courts. It has been· said that 'the cases on the subject present an almost hopelessly tangled mass of reason and unreason such as is not often confronted in the law.' Zollman, American Law of Charities, sec..813."

Another court in *Gable* v. *Salvation Army*, 186 Okl. 687, 100 P2d 244, 245, said:—

> "When the English doctrine, that charitable organizations were immune from tort liability, was repu-

> diated in this country in the case of *Glavin* v. *Rhode Island Hospital,* 1879, 12 RI 411, 34 Am Rep 675, there was precipitated a continuing controversy, remarkable not only for the widely divergent opinions as to the extent to which this immunity should extend, but also because of the irreconcilable reasons advanced as grounds for granting any immunity whatever."

The cases may be generally classified into three groups, which, for our purposes we may call, 1st, The non-liability cases, that is, those that deny any liability whatever. 2nd, The total liability cases, that is, those that apply the regular negligence rules. 3rd, The partial liability cases, that is, those that grant liability for the benefit of certain classes of plaintiffs but not for others or against the defendant for negligence in some ways but not in others. It may be said generally that the weight of authority numerically as to jurisdictions between the non-liability and total liability doctrine lies with the non-liability jurisdictions. The trend of the more recent cases, however, is towards total liability. As between the non-liability jurisdictions and the partial liability ones, the weight of authority lies with the partial liability jurisdictions.

We will not attempt to cite and classify the numerous cases in each group or classify and attempt to analyze them under the different theories by which the decisions have been reached. Such a treatment of them would cause this opinion to be of undue length. Most, if not all of them, except some recent ones, will be found cited and in many instances commented upon in annotations in 14 ALR 572; 23 ALR 923; 30 ALR 455; 33 ALR 1369; 42 ALR 971; 62 ALR 724; 86 ALR 491; 109 ALR 1199; 133 ALR 821; also in 10 Am Jur Charities, sec. 140-154; 14 CJS Charities, sec. 75. See also Freezer, The Tort Liability of Charities, 77 U. Pa. L. Rev. 191; Prosser, Torts, 1080; Zollman, Damage Liability of Charitable Institutions, 19 Mich. L. Rev. 395. There are also many opinions in which the whole subject has been discussed and the cases extensively analyzed, some of which will be cited and mentioned in this opinion. The subject is, as we have said, an open question in this jurisdiction and as we have had the benefit of excellent briefs and oral argument we think we should review the matter quite fully.

Even in so doing and confining ourselves to a brief review of specific cases and different theories advanced, this opinion will be longer than we would otherwise desire.

The non-liability cases are generally founded on what is called the "trust fund" theory. This is based upon the reasoning that the assets of the institution created by the founders thereof constitute a trust for particular charitable purposes and if it should be diverted to the payment of judgments that might be obtained in suits against the institution, the purpose of the charity as well as that of its donors would be frustrated and the charity perhaps destroyed. This theory was first introduced in an 1848 English case of *Heriot's Hospital* v. *Ross,* 12 C. & F. 507. Its essence seems to be that the preservation of the charitable trust funds is more desirable than the right to compensation from the funds for an injury inflicted by the operation of the charity. It was repudiated in England in 1866 in the case of *Mersey Docks* v. *Gibbs,* 11 H. L. 686. Both England and Canada now hold a charity to the universal standard of care. *Hillyer* v. *St. Bartholomew Hospital,* 2 K. B. 820 (1909); *Donaldson* v. *General Public Hospital,* 30 N. B. 279 (1890); *Lavere* v. *Smith's Falls Hospital,* 35 Ont. L. Rep. 98.

This "trust fund doctrine" has been upheld in several jurisdictions in this country and when first adopted it was mainly on the basis of dicta of several of the Lord Justices in the so-called Heriot Hospital case, supra. What was said by the court in *Andrews* v. *Young Men's Christian Assoc.,* 226 Iowa 374, 284 NW 186, 189, is pertinent:—

> "The first court in this country to proclaim its adherence to the trust fund doctrine was the Supreme Court of Massachusetts in 1876, *McDonald* v. *Massachusetts General Hospital,* 120 Mass 432, 21 Am Rep 529. It gave the early English cases as its authority, apparently oblivious of the fact that the same court which had given the doctrine life, had put a quietus on it ten years before. Following the lead of Massachusetts, other courts in this country adopted the same rule. Some of them, fearful of a rule which practically placed charitable institutions above and beyond the law with respect to non-liability for neg-

ligence, began to modify the rule. They refused to permit exemption from liability unless the charitable institution had shown due care in the selection of its servants and agents. Such an exemption is wholly inconsistent with, and a repudiation of the trust fund doctrine, since an enforcement of the exemption would, itself, effect a depletion of the trust fund. If the trust fund doctrine is sound, an institution, engaged in public charitable, eleemosynary, or religious work, could not be held responsible in tort to any plaintiff, so far as trust property might be used to discharge the liability. This doctrine has been very generally disapproved and rejected in this country." (citing a long list of cases).

Some courts holding to this theory have based their decisions upon the ground that the funds, being set apart for a particular purpose, cannot be taken upon execution. This reasoning ignores the fact that the court should not be concerned with the ability to have the judgment satisfied, but only with the right to obtain the judgment. It is of no importance that the property of the defendant was exempt from execution by reason of its character and that, therefore, recovery against it could be of no avail. *Armendez* v. *Hotel Dieu,* Tex Civ App, 145 SW 1030.

The trust fund theory has been severely criticized by many American courts. Among others may be cited *Gable* v. *Salvation Army,* 186. Okl 687, 100 P2d 244, and cases cited; *Glavin* v. *Rhode Island Hospital,* 12 RI 411, 34 Am Rep 675; *Hewett* v. *Women's Hospital Aid Assoc.,* 73 NH 556, 64 A 190, 7 LRANS 496; *Geiger* v. *Methodist Episcopal Church,* 174 Minn 389, 219 NW 463, 62 ALR 716; *Tucker* v. *Mobile Infirmary Assoc.,* 191 Ala 572, 68 S 4, LRA 1915 D, 1167; *Nicholson* v. *Good Samaritan Hospital,* 145 Fla 360, 199 S 344, 133 ALR 809; *Andrews* v. *Young Men's Christian Assoc., supra; Bruce* v. *Central Methodist Church,* 147 Mich 230, 110 NW 951, 10 LRANS 74, 11 Ann Cas 150; *Hordern* v. *Salvation Army,* 199 NY 233, 92 NE 626, 32 LRANS 62, 139 Am St Rep 889; *Phoenix Assurance Co.* v. *Salvation Army,* 83 Cal App 455, 256 P 1106. See also dissenting opinions where the majority held in favor of it.

The soundness of the theory and its justice was put to a test when cases came before the courts that involved the question of whether or not a charity was liable whose agent or servant, in carrying out its objects, negligently inflicts injury to an entire stranger to the transaction. It was at once apparent that no principle was sound or just that would absolve a charitable institution from liability in running down a pedestrian on the highway. The general criticism was expressed by the court in *Putnam Memorial Hospital* v. *Allen,* 34 F2d 927, a case that arose in this state that involved a hospital ambulance colliding with an automobile driven by the injured plaintiff, wherein the court, in the absence of a decision in this state on the question stated :—

> "To hold that a charitable institution whose agent negligently runs down a person on the street, need not respond in damages, although the circumstances are such as would render any other defendant liable, seems to us a monstrous doctrine. It is true that several courts of high authority have gone to this extreme (citing cases), but in our opinion no adequate reason has been, or can be advanced, for allowing the purpose of the settlor of trust funds to introduce into the law a principle which, to us, appears so anomalous or so unjust. We prefer the reasoning of cases which have applied the ordinary rules of liability to such a situation as is now before the court." (citing cases).

On principle, it would seem that a charitable trust is either exempt from liability for negligence in all cases or none. *Nicholson* v. *Good Samaritan Hospital, supra.* The Supreme Court of Nevada in *Bruce* v. *Y. M. C. A.,* 51 Nev 372, 277 P 798, 802, in a brilliant analysis, flatly repudiates the trust fund theory, stating in part :—

> "A flood of cases might be cited holding that a charitable institution is liable for its negligence in the selection of its employees, for the negligence of its employees to strangers, or for some other reason. Every decision so holding, no matter how astutely the court may seek to evade the real question—that is, the

> charitable trust theory—is in fact, where the question is presented, a denial of that doctrine, for as we have said, in substance, a charitable institution is either exempt or it is not. No sophistry, no refinement of argument, can consistently hold that a charitable institution is exempt in one case and not in the other."

We do not deem it necessary to cite other specific cases. They are all, or nearly all, collected in the annotations and other authorities that we cited in the first part of this opinion. All are agreed that the great weight of authority is for total liability in the case of injury to so-called strangers. We subscribe to that doctrine.

The next class of cases that should be mentioned is the one involving injury to a servant or employee through negligence in the performance of some duty owed him. What has been said in regard to the "stranger" cases is applicable to these so-called "servant" cases. They are treated in the same annotations and authorities and the weight of authority is in favor of total liability in these cases and for reasons that are as convincing and persuasive as in the "stranger" cases. They, again, are inconsistent with the trust fund theory; in fact, many of them discuss and repudiate it. We agree with them.

We have tried to demonstrate that the trust fund theory is not sound. It is well expressed and we subscribe to what the court said in *Tucker* v. *Mobile Infirmary Assoc., supra,* when it stated in part:

> "Followed to its logical conclusion, this theory (trust fund theory) would result in absolute immunity from damages of any character being recovered against such institution, which would exempt them from liability of a servant to the patient, and to a third person and, indeed, it would also seem to exempt them from damages from the breach of an expressed contract. The doctrine, we think, it clearly appears, can find no support in the English authorities. . . . What we have here said, and the authorities we have cited, we think, are all sufficient to show that the trust fund theory is no solid foundation

> upon which to rest, and is repudiated in the modern
> well considered cases, and even in some of the states
> (as in the Downes case, supra), where it is sup-
> posed to have once been applied."

There is another class of cases known as the "beneficiary" cases. A beneficiary is spoken of as one who is receiving some type of benefit from the charity at the time of injury. In view of what we have said about deciding this case upon the broad question of liability or non-liability of a private charity, whether this plaintiff was or was not a beneficiary at the time she was injured becomes immaterial. However, the attorneys for the plaintiff have urged strenuously that as soon as the plaintiff left the premises she ceased to be a beneficiary and the attorneys for the defendant have, just as strenuously, urged that as she was a member of the defendant's parish and had been to a religious service on the premises the beneficiary relationship did not cease when she reached the public sidewalk. We, therefore, discuss the subject and point out some faults in the theory. We have had no case remotely like the present one called to our attention.

One weakness in the beneficiary theory is the difficulty in determining when a person is or is not a beneficiary. It can be conceded that this plaintiff or any normal person goes to a religious service for spiritual enrichment which also results in a certain moral, mental, physical uplift and benefit. There is no logical line of demarcation as to where or when that ceases. There is no logical place where or time when the benefits from a successful operation in a hospital cease. The beneficiary cases, therefore, have no solid foundation from which to reason. They are like a house built upon the sand.

If we assume, as claimed by the defendant, that the plaintiff was a beneficiary, non-liability, according to the reasoning of these cases, is based upon the theory that the beneficiary has waived the right to recover or that the doctrine of respondeat superior does not apply to a private charity.

The waiver theory is only fiction. It can have no foundation of fact in many cases. It cannot be said that a patient taken to a hospital in an unconscious condition knowingly waived the right to recover for negligence that might occur while the patient was still unconscious. Neither can it be said that a small child in attending

a church service knowingly waived the right to recover for negligence. The theory is based upon nothing but the assumption of an implied contract against future negligence.

The theory that the doctrine of respondeat superior does not apply to a private charity in the relationship between itself, its servants or agents and an injured person and that it is only liable for negligence in the selection of its servants and agents needs very little comment. We have seen it is not followed in the cases of liability for injuries to strangers and servants. Non-liability can easily breed neglect. The public, as well as patients and others, are interested in having hospitals and in fact any private charity that is open to the public properly conducted, in having its buildings and facilities safe, and in having its agents and servants perform their duties carefully and without negligence. We cannot subscribe to that theory and therefore free such an institution, thereby giving it special consideration, from the negligence of its agents or servants and render it liable only for negligence in its selection of them. *Sheehan* v. *North Country Community Hospital,* 273 NY 163, 7 NE2d 28, 109 ALR 1197; *Basabo* v. *Salvation Army,* 35 RI 22, 85 A 120, 42 LRANS 1144; *Sessions* v. *Dee Memorial Hospital,* 94 Utah 460, 78 P2d 645.

■ The defendant urges that public policy dictates that charitable institutions shall be exempt from liability for negligent injury. Some courts have decided in favor of non-liability on that ground. It is nearly analogous to the trust fund doctrine. Its essence is that suits for injury would cause a depletion of the funds of the charity, thereby depriving the public of its benefit and that the rights of the individual who is injured to redress should be subservient to the interest of the general public in the preservation of the institution; that it is better that one rather than many suffer; that the advantages to the public outweigh the detriment to the individual who has been injured. There is no sufficient reason under a sound public policy requiring this court to say that an individual be deprived of his right to recovery from such an institution because its funds are derived from a charitably minded public. The enforcement of the individual's rights to recover will not deprive the public of the benefits of the institution. That has been shown to be true in those jurisdictions where liability is the law. A charity should not be permitted to inflict injury upon one with-

out redress in order that it may do charity to others. The result would compel the injured person to contribute to the charity against his will. If such person were seriously injured or incapacitated for life, it might result in the charity that caused the injury being freed from responsibility and the burden for the care and support of the injured person falling upon some other charity or even upon the very public supporting the negligent institution. The financial burden could very easily be shifted from the responsible charity to an innocent one in no way connected with the injury. The public is concerned with the way these institutions are managed if they are to be of the most service to mankind. It is of vital importance that they be properly managed and controlled. If they are relieved from negligence it gives them an opportunity to be careless without redress and puts a premium on the neglect of duty. Men are not necessarily careful and there should be no failure to exercise ordinary care. Neglect of duty should be prevented, not encouraged.

Private charities are much different now than when the liability question was first before the courts. Then they were largely small institutions, many connected with churches, and of limited means. Today they have become, in many instances, big businesses, handling large funds, managing and owning large properties and set up by large trusts or foundations. It is idle to argue that donations for them will dry up if the charity is held to respond for its torts the same as other institutions or that the donors are giving the funds or setting up large foundations for charitable purposes with the expectation that the charities they benefit will not be responsible like other institutions for negligent injury. Such charities enjoy endowments and resources beyond anything thought of when the matter of immunity was first being considered.

What the Iowa court said in *Andrews* v. *Y. M. C. A., supra,* when discussing the subject of public policy is so pertinent that we quote from it at length:

> "We have great respect for those courts, who in their opinions noted herein, have held that charitable organizations were exempt from responsibility in damages to persons injured through the negligence of those organizations, . . . but we do not believe that either sound reason or logic, or sound principles

of law, or the demands of sound present-day public policy, justify those adjudications. It is significant that public policy has never demanded legislation exempting charitable institutions from responsibility for their negligence. . . . The funds of such institutions may be depleted as effectively by improvident contracts as by negligence. Where the legislature has not granted an exemption it may be questionable whether the courts have such power. If they do grant such an exemption, as we are asked to do in this case, it is only because the sound public policy of this state demands it. In earlier days such an exemption as is asked by the appellant may have been in accord with the then public policy. But public policy is not static. It changes with the changes in the times. It changes as the needs of the people, the mode of their living, and the manner and methods of doing business change. The legislatures and the courts must keep as closely abreast as they can. The administration of charities, twenty, fifty or a hundred years ago was simpler than it is now. Charitable organizations maintain large institutions and properties, both for investment purposes and for carrying on the work itself. They employ large numbers of employees, automobiles, and the modern equipment of other business concerns. . . . In doing charity they might cause misery without any financial consequences. Public policy in Iowa does not demand any such impunity for its charitable institutions. Every dollar donated for charity is not spent in actual relief. Part of each dollar must go for overhead and current expenses. Individuals and private business avoid the full burden of such risks by scattering those burdens over and among the people as a whole, by insurance of various kinds. Why should not charitable institutions do the same? No doubt the appellant carries fire insurance on its large building. . . . If it thus protects itself why should it not spend part of its donated funds in premiums

for public liability and employee liability insurance, against the day when a stranger, or an invitee, or its employee may be injured by its negligence? Every one who ·donates for its charity expects it to carry such protection. ·There is nothing which so begets and fosters care and diligence as responsibility. Irresponsibility breeds and encourages opposing traits. Requiring the payment of compensation for negligence serves two purposes. It pays an obligation to the injured party, and it is a warning to the offender and to the public that justice and the law insist upon the exercise of due care. And nowhere is the exercise of the highest degree of care so necessary, and so to be desired, as in ministering to the sick and the helpless, and those relying on the skill and superior knowledge of some one else."

In the case of *Nicholson* v. *Good Samaritan Hospital, supra,* it is said:

"There is no doubt but that the public has an interest in the establishment and maintenance of charitable institutions, whose beneficent value is generally recognized and appreciated, but it has also an interest in obliging corporations undertaking the performance of charitable duties, vitally affecting the lives and health of our citizens, to perform them carefully, and therefore the public has an interest in this matter of exempting a charitable corporation from liability for its negligence. A charitable institution should be just before being charitable or generous."

The court in *Tucker* v. *Mobile Infirmary Assoc., supra,* stated:

"As previously stated in this opinion, we recognize that the weight of authority in this country is opposed to the conclusion we have here reached. This within itself is, of course, of much force, and has led us to a very careful review of the cases, and a consideration of the principles upon which they may be said to rest. But it sometimes happens that in order to reach a safe harbor one must row against the

current. We have here endeavored to show that the theory upon which those cases are founded does not measure with the rule of reason or sound logic, as we view it. . . . It is not for this court to create exemptions or declare immunity from liability in a case of this character as shown by this record. . . ."

To the same effect are the following cases: *Glavin* v. *Rhode Island Hospital, supra; Gable* v. *Salvation Army, supra; Bruce* v. *Central Methodist Episcopal Church,* 147 Mich 230, 110 NW 951, 10 LRANS 74, 11 Ann Cas 150; *McInerny* v. *St. Luke's Hospital,* 122 Minn 10, 141 NW 837, 46 LRANS 548; *Milliner* v. *Evangelisher Diakonniessenverein,* 144 Minn 392, 175 NW 699; *Basabo v. Salvation Army,* 35 RI 22, 85 A 120, 42 LRANS 1144; *Geiger* v. *Simpson Methodist Episcopal Church,* 174 Minn 389, 219 NW 463, 62 ALR 716; *Basabo* v. *Salvation Army, supra; Sessions* v. *Dee Memorial Hospital, supra; Phoenix* v. *Salvation Army, supra.* See also Bogert, Trusts and Trustees, Vol. 2, sec. 401.

The defendant calls our attention to the following provision of our Vermont Constitution: Chapter II, Section 64, which reads in part:

". . . And all religious societies, or bodies of men that may be united or incorporated for the advancement of religion or learning, or for other pious or charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities and estates, which they in justice ought to enjoy, under such regulations as the General Assembly of this State shall direct."

We call particular attention to the last part of that provision, namely: "which they in justice ought to enjoy, under such regulations as the General Assembly of this State shall direct." The defendant says that an immunity or exemption from liability would be in accord with both the letter and the spirit of whole provision. As previously indicated, this is not such an exemption as the constitution requires "they in justice ought to enjoy."

The fact that this defendant is a privately conducted religious and charitable institution does not entitle it to any exemption or immunity from liability for injury caused by negligence.

The declaration has an allegation in regard to maintaining a public nuisance. From what we have said it is apparent that the defendant is liable for maintaining a public nuisance the same as any other defendant. We do not decide, however, whether the facts alleged, if proved, would be sufficient to sustain such an allegation.

The result is, that the facts alleged in Count 1 of the answer are not any defense to the defendant against the cause of action set forth in the plaintiff's declaration and the demurrer should have been sustained.

*The decree overruling the demurrer is reversed. Plaintiff's demurrer to Count 1 of the defendant's answer is sustained and the cause remanded.*