## Thomas Wolfe v. Allen F. Yudichak and Norwich University

[571 A.2d 592]

No. 86-176

Present: Allen, C.J., Peck, Gibson, Dooley and Mahady, JJ.

Opinion Filed April 14, 1989
Second Dissenting Opinion Filed May 15, 1989.
Motion for Reargument Denied December 8, 1989

*Rubin, Rona, Kidney & Meyer*, Barre, for Plaintiff-Appellant Wolfe.

*Valsangiacomo, Detora, McQuesten, Rose & Grearson,* Barre, for Plaintiff-Appellant deKramer.

*Peter B. Joslin* of *Theriault & Joslin, P.C.,* Montpelier, for Defendant-Appellee.

**Dooley, J.** Plaintiff appeals from a decision of the Washington Superior Court granting defendant summary judgment on the ground that the Vermont Workers' Compensation Act, 21 V.S.A. ch. 9, provides the exclusive remedy for plaintiff's injury. See 21 V.S.A. § 622. Because we find that plaintiff is not entitled to workers' compensation benefits, we reverse.

The facts are not in dispute. Allen Yudichak and Thomas Wolfe were students at Norwich University and members of the Norwich University Fire Brigade, a volunteer fire department sponsored by the University. Although the fire brigade is a student activity of Norwich University, it does have a constitution, bylaws and a membership roll. The fire brigade refers to itself as "this organization" throughout its constitution and bylaws. The brigade elects its own officers, prepares its own budget and develops and implements its own training procedures. The primary purpose of the brigade is to educate its members in firefighting. The members are not paid.

On April 29, 1984, in response to an alarm, defendant Yudichak drove the brigade fire truck on which plaintiff Wolfe rode. On the way to the fire, the truck skidded off the road and rolled over. One student was killed and plaintiff Wolfe was seriously injured.

Plaintiff alleged that Yudichak operated the truck in a negligent fashion in large part because he was under the influence of alcohol at the time. Because the students were acting in the scope of their duties as firefighters, Wolfe filed suit against Norwich University alleging respondeat superior and negligence for failing to properly supervise and train the student firefighters. Norwich University moved to dismiss this action, asserting that it had elected to provide members of the Norwich University Fire Brigade with workers' compensation coverage by the purchase of an insurance policy covering the accident that was the subject of the complaint. Because Wolfe was cov-

ered by workers' compensation, Norwich argued, the claims against it were barred by the exclusivity provision of 21 V.S.A. § 622. The superior court agreed with Norwich and dismissed the complaint.

Plaintiff asserts four claims on appeal. He argues that: (1) the court erred by determining that the Norwich University administration could elect to provide workers' compensation for the Norwich University Fire Brigade; (2) the court's interpretation of Workers' Compensation Act to include volunteers violates chapter II, § 20 of the Vermont Constitution; (3) the failure of the Act to provide wage compensation to plaintiff violates Chapter I, Article 4 of the Vermont Constitution; and (4) the failure of the Act to provide wage compensation to volunteer firefighters who have no other employment violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and Chapter I, Article 7 of the Vermont Constitution. We agree with plaintiff's first claim and, therefore, reverse and remand without reaching the remaining claims.

The superior court's decision is based on 21 V.S.A. § 601(12)(L), which defines "public employment" to include:

> (L) members of any regularly organized private volunteer fire department while acting in the line of duty after election by the organization to have its members covered by this chapter;

This subsection is part of a list of alternative types of public employment, which, pursuant to 21 V.S.A. § 601(4), is defined as part of "employment" and pursuant to 21 V.S.A. § 616(a) creates coverage by the Workers' Compensation Act. If § 601(12)(L) applies in this case, there is no question that plaintiff was in public employment and is covered by the Workers' Compensation Act. Thus, he is entitled to compensation under 21 V.S.A. § 618 and is barred from other remedies by 21 V.S.A. § 622.

The statutory provision, 21 V.S.A. § 601(12)(L), contains three elements as follows: (1) the injured person must be a member of a regularly organized private volunteer fire department; (2) the injury must have occurred while the injured per-

son was acting in the line of duty; and (3) "the organization" must have elected to cover its members under the Workers' Compensation Law. Both parties agree that the first two elements are present. Plaintiff argues that the third element is not present in this case because "the organization" specified in the statute is the Norwich Fire Brigade and the brigade has never elected to cover its members. Norwich counters that the organization is Norwich University and it has made a valid election to cover the members of its fire brigade. Four reasons lead us to conclude that the plaintiff has the better argument and that no valid election of workers' compensation coverage was made in this case. Therefore, plaintiff is not entitled to workers' compensation for his injuries and the exclusivity bar of 21 V.S.A. § 622 does not apply. As a result, it was error to grant the motion to dismiss.

The first reason is that an election by the brigade, as opposed to Norwich University, is commanded by the literal and plain meaning of the language of the statute. Although our overall aim is to determine the intent of the Legislature, we must first look to the plain meaning of the words. See *Derosia v. Book Press, Inc.*, 148 Vt. 217, 222, 531 A.2d 905, 908 (1987). The operative wording here is "after election by the organization to have its members covered by this chapter." In this context, the "organization" must be the fire brigade. It cannot be Norwich University because the firefighting students are not "members" of Norwich University. The requirement that the department be "regularly organized" underscores this interpretation in two ways. First, it uses a form of the root word—"organize"—the same root word for the term "organization" in the clause we are interpreting. Thus, it is logical that the "organization" in the third clause is the entity that has been "organized" in the first clause. That entity is the fire brigade, not the whole university. Second, the requirement mandates a sufficient governing structure to make an election. If the fire brigade is "regularly organized," it has sufficient structure to make an election—its constitution and bylaws support the adequacy of its organization in this case.

■ Second, we must read the operative section in context and the entire scheme in pari materia. See *In re Reclassification of Ranch Brook*, 146 Vt. 602, 605, 508 A.2d 703, 705 (1986); *Paquette v. Paquette*, 146 Vt. 83, 86, 499 A.2d 23, 26 (1985). There are other definitional sections that help us in interpreting the one before us. Those sections clearly specify who must make the election so that coverage is extended. Thus, § 601(12)(J) makes volunteer reserve police officers public employees where the selectmen of a town or the trustees of a village so vote. Section 601(12)(K) makes "other municipal workers, including volunteer fire fighters" public employees if the "governing officials" of the municipal body so vote. The fact that these other sections clearly specify who decides whether to elect workers' compensation coverage cuts against a similar result where the statute does not clearly specify. *State v. Tierney*, 138 Vt. 163, 165, 412 A.2d 298, 299 (1980) (if, in its next clause, a statute was to achieve a particular result, the Legislature could have achieved this result as it did in earlier clause); see also *Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975) (when interpreting a statute a court should not be guided by a single sentence or member of a sentence, but must look to the provision of the whole law); *State v. Teachout*, 142 Vt. 69, 72, 451 A.2d 819, 820 (1982) ("In construing a statute we consider it as a whole, and, if possible, give effect to every word, clause, and sentence."). If the Legislature had intended to specify that the election be made by the employer, the surrounding sections show that it knew how to implement that intent. It did not demonstrate that intent in § 601(12)(L).

We recognize that other parts of the public employment definition allow election of coverage solely by the decision of the employer. We do not believe, however, that these subsections should be taken as a general endorsement of placing elections in the hands of the employer. The subsections which allow for employer election, 21 V.S.A. §§ 601(12)(J) and (K), apply to municipal volunteer police officers and firefighters. Volunteers in municipal government are faced with a very different situation because communities are protected against negligence actions by sovereign immunity. *Welsh v. Village of Rutland*, 56 Vt. 228

(1883) (an incorporated village is not liable for injuries resulting from negligence of an engineer of fire department); see also *Cronin v. State*, 148 Vt. 252, 256 n.5, 531 A.2d 929, 932 n.5 (1987) (this Court refuses to abolish sovereign immunity doctrine); *Lomberg v. Crowley*, 138 Vt. 420, 424, 415 A.2d 1324, 1327 (1980) (sovereign immunity remains a viable doctrine); *Marshall v. Town of Brattleboro*, 121 Vt. 417, 424, 160 A.2d 762, 767 (1960) (doctrine reaffirmed). Thus, the decision whether to accept liability through workers' compensation or the tort system normally resides with the municipality. Such a decision is exercised through the purchase of insurance. See 29 V.S.A. § 1403 (purchase of insurance is waiver of sovereign immunity). The employees of a municipality have no real election since their common-law remedies are barred by sovereign immunity solely. Such employees have a remedy due to the election of their employer.

On the other hand, Vermont has rejected the rule that charitable institutions are immune from suit. *Foster v. Roman Catholic Diocese*, 116 Vt. 124, 133–34, 70 A.2d 230, 235–36 (1950). It is very likely, therefore, that the Legislature intended to treat public and private volunteer fire departments differently.

Third, it is likely that the workers' compensation law offers plaintiff no effective remedy. The Workers' Compensation Act provides compensation of two-thirds of the employee's average weekly wage in cases of total disability. 21 V.S.A. § 645. Since that method of calculating compensation would lead to no award for volunteer firemen, the Legislature has provided two alternative methods of calculating compensation. The statute provides that the average weekly wage of a volunteer fireman injured in his duties as a fireman "shall be his average weekly wage in his regular employment." 21 V.S.A. § 650(a). It also provides that in instances where "it is impracticable" to compute the employee's rate of remuneration, compensation can be based on the earnings of other persons employed in the same work by the employer or "by a person in the same grade employed in the same class of employment and in the same district." *Id.*

It is unlikely that the statute authorizes any award in this case. Since plaintiff is a volunteer, he has no average weekly wage from firefighting. The statutory alternative for volunteer firemen—to use the average weekly wage from regular employment—gives no compensation because plaintiff is a student.

We recognize that the Commissioner of Labor and Industry has apparently adopted as a policy that for "volunteer public safety workers" without other "regular employment" the average wage is computed as the average weekly wage of "similarly responsible, paid employees in the same occupation."* Vermont Dep't of Labor & Industries, Processes and Procedure for Claims Under the Vermont Workers' Compensation and Occupational Disease Acts Rule 14, Form 25 at 11-12. The Commissioner must, however, act pursuant to statutory authority and consistent with the applicable statute. *New Hampshire-Vermont Physician Service v. Commissioner, Department of Banking & Insurance*, 132 Vt. 592, 596, 326 A.2d 163, 166 (1974) ("A public administrative authority has only such powers as are expressly granted by the Legislature, together with those implied as necessary for the full exercise of those granted."). The only possible authority for this policy is the second alternative method of calculating average wages in 21 V.S.A. § 650(a). The statute applies, however, only where a wage calculation is otherwise "impracticable," not, as here, where there are no wages at all, and requires a comparison to a person "in the same grade" and in the "same class of employment." *Id.* A full-time fireman is not in the same grade and class as a part-time student volunteer.

Even if the statute were read to allow payment of compensation, the amount is meager at best. According to survey data from the Vermont Department of Employment and Training, the average hourly wage of firefighters in small Vermont communities (under 4000 residents) is $4.10 per hour and in large Vermont municipalities (over 4000 residents) is $7.70 per hour. Vermont Dep't of Employment & Training, *Wage and Fringe*

---

* The policy is actually directions for completing claims forms. There is no indication in this case that it is a rule to be considered prima facie evidence of the proper interpretation of the statute under 3 V.S.A. § 845(a).

Benefits Survey 27-28 (1987). Since compensation payable equals two-thirds of average wages, the amount actually paid to plaintiff would put him under the poverty level if the average for small communities is used. See Administrative Order No. 4, Appendix B (Feb. 1989) (poverty income guidelines). If the average for larger communities, or a blend of both, were used, plaintiff's income would exceed the poverty level but would come nowhere near the earning capacity that could be expected of a college graduate in engineering (plaintiff's major), even at graduation. See College Placement Council, *CPC Salary Survey* 2 (Sep. 1988) (average 1988 starting salary for male engineering graduates varied between $24,500 and $31,500 per year).

In summary, if we adopted defendant's position, plaintiff would be left with an uncertain and precarious entitlement to a meager income based on the income of persons in an occupation that plaintiff was never part of and was not ever to be part of. The income of firefighters has no more relevance to plaintiff's situation than those of any other occupation selected at random. See *State v. Lund*, 144 Vt. 171, 177, 475 A.2d 1055, 1059–60 (1984) ("It has long been the policy of this Court to avoid a construction of a statute 'that will render the act ineffective or lead to irrational consequences.'") (quoting *Audette v. Greer*, 134 Vt. 300, 302, 360 A.2d 66, 68 (1976)); *New England Power Co. v. Town of Barnet*, 134 Vt. 498, 509, 367 A.2d 1363, 1370 (1976) (this Court will not presume that Legislature intended unjust or unreasonable results). While the Legislature could decide to leave volunteer firefighters in such circumstances, we think it more likely that they enacted a check on the unwilling assumption of such a harsh result. The Legislature did this through a requirement that the election be made by affected persons, presumably after a full evaluation of the alternatives.

Finally, we can find no policy reasons why defendant, Norwich University, should have the sole right of election with no voice given to the volunteer firefighters. See, e.g., *Hill v. Conway*, 143 Vt. 91, 95, 463 A.2d 232, 234 (1983) (this Court considers what "public policy" a statute "appears designed to implement"). If the fire brigade were free-standing, the deci-

sion to elect workers' compensation coverage would be made by the board of directors or officers, persons elected directly or indirectly by the members. In this case, the fire brigade has all the organizational elements of a corporation; it makes no sense to have a different election rule because the brigade happens to be affiliated with a university or, for that matter, a private business.

■ For the above reasons, plaintiff is not entitled to workers' compensation for his injuries in the accident in this case and the motion to dismiss should not have been granted.

*Reversed and remanded.*

**Allen, C.J.,** dissenting. I believe the applicable statutes compel a contrary result. I would also observe without fear of serious contradiction that had the plaintiff asserted a claim for and been awarded workers' compensation benefits, this Court, without dissent, would have affirmed the grant of the award. It has been repeatedly held by this Court that the remedial purposes of the Act require a liberal interpretation of its provisions in order to accomplish its intended purposes. See *Montgomery v. Brinver Corp.*, 142 Vt. 461, 463, 457 A.2d 644, 646 (1983). Its provisions are not to be rigidly applied to defeat these purposes. The majority opinion ignores these dictates of statutory construction and may frustrate the application of the Workers' Compensation Act in future cases brought by workers seeking the benefits of the Act.

**Peck, J.,** dissenting. It is not possible to feel anything less than the deepest compassion for the young plaintiff who incurred serious and apparently permanent injuries as a result of the tragic accident of April 29, 1984, an accident in which another Norwich University student lost his life.

Sympathy in the face of such devastating tragedy is a natural, human and humane response. I am sure it is felt by each member of this Court regardless of whether he joins with the unfortunate majority opinion or writes separately in dissent. Nevertheless, expressed in its simplest elemental form, the majority opinion is bad law. It reflects, too clearly, particularly in several of the closing paragraphs, that it is result-oriented and

emotion-motivated. As the Chief Justice points out in his dissent, citing a case in point, "the remedial purposes of the Act require a liberal interpretation of its provisions in order to accomplish its intended purposes." The majority opinion is hardly consistent with that purpose.

The majority appear to blow about like a straw in the wind. If sympathy motivates a liberal construction of the Act, it will be construed broadly to bring the subject within the scope of its benefits. On the other hand, in the rare case when it is in the subject's interest to declare him ineligible for benefits, and his situation appeals to the sympathetic emotions, the majority seems prepared to execute an abrupt volte face, whirl around like a weather vane, and adopt an unreasonably strict construction which holds that, indeed, the subject was not entitled to workers' compensation.

This pattern can be demonstrated by a comparison of the result reached here, and the majority decision in *Derosia v. Duro Metal Products Co.*, 147 A.2d 410, 413–14, 519 A.2d 601, 604 (1986). In the latter case, the majority, employing an extremely broad and liberal construction of the Act, and contrary to what may be the greater weight of authority, extended third-party liability potential to include the insurance carrier. In the instant case, the majority shrinks entitlement to a degree that may well embarrass attempts at distinction which must inevitably become necessary in the future.

Cases such as *Derosia, Simpson v. State Mutual Life Assurance Co.*, 135 Vt. 554, 382 A.2d 198 (1977), and the case before us disclose still another unfortunate tendency of this Court. That is, to assist certain plaintiffs, who employ the so-called shotgun approach to litigation, by finding some basis, however strained, to impose potential liability on a given defendant simply because the latter has the "deepest-pocket" among the named defendants, and the primary defendant may be judgment proof. In fact, that may well be the case here.

While I am in full accord with the dissent of the Chief Justice in this case (as I was in *Derosia*), I have further grounds for dissent that compel me to write separately and at considerably greater length.

An initial and underlying flaw in the majority opinion is the incredible assumption that the Norwich University Fire Brigade exists in a sort of vacuum, wholly independent of the University and not subject to its continuing overall supervision, control or approval. Such an entity might evolve if two or more individuals, who just happened to be or become Norwich students, established a small business operation in Northfield, or elsewhere for that matter, as a partnership or corporation, hired their own workers, arranged for business space and supplies, and, in fact, did all other things consistent with and essential to the operation of an independent business enterprise.

That is simply not the case here, nor is there the slightest scintilla of evidence to suggest the absurd conclusion to the contrary by the majority that the Brigade is (or was) independent of the University.

The majority conclusion is based on the sole fact that the Brigade had a "constitution" of its own. This is no evidence of an independent existence. If it were, any campus organization, although approved and sponsored by the University, an athletic team, for example, a dramatic society, a band or orchestra, could separate itself and become wholly independent of, and in no way accountable to, the University by the simple expedient of working up a constitution of sorts for internal purposes. This would be laughable were it not for the unfortunate result that a student member of an organization, otherwise eligible for workers' compensation, would be denied its benefits regardless of the fact that no legitimate cause of action otherwise existed against the University. I submit that, for purposes of establishing the independent status of a collegiate subordinate organization vis-a-vis the college itself, a constitution is meaningless without much more than is disclosed by the record here.

It is possible that a different case might be made if the Brigade was chartered as a corporation by the state, or filed appropriate partnership documents. No such entity ever existed. An admittedly inexact analogy might be drawn based on the relationship between the fifty states, individually, and the United States as a national entity. The mere fact that each state has its own constitution does not mean they are not subject primarily

to the mandates and controls of the federal constitution, and the laws enacted by the Congress pursuant thereto.

Notwithstanding the majority opinion, both plaintiff and the majority failed completely to demonstrate the necessary independence of the Brigade from the University. But this was an essential element upon which a denial of workers' compensation might have been predicated. Indeed it must be the very foundation of plaintiff's entire case to the point that his failure to do so alone justified the grant of summary judgment as to the University.

Not only did plaintiff fail in his obligation, but without going into the record in elaborate detail, the evidence is all against the plaintiff on this underlying issue. The very name of the organization, "Norwich University Volunteer Fire Brigade," suggests that the Brigade was, in fact, an "arm" of the University. There was no evidence that the members of the Brigade were not well aware that they were supposedly protected by workers' compensation and acquiesced in the coverage which was designed for their benefit. There was no objection to the coverage or indication that they would have preferred to take the risk of being unable to establish a claim against the University in a tort action in the event of an injury while engaged in a Brigade activity. There is no indication that the Brigade's equipment was provided with its own independent funds or that the equipment was housed, maintained and repaired at the independent expense of the Brigade or its members; in fact, the evidence is to the contrary; these were all furnished by the University.

It appears that since and because of the accident the University has abolished the Brigade. I doubt the plaintiff would attempt to argue that this action required a vote to dissolve by the membership. Clearly, for purposes of workers' compensation, particularly for purposes of the Act and the required liberal construction which would protect the Brigade members, the "organization" was the University.

The following responds to the two issues considered by the majority and, because I find the basis for the majority viewpoint to be lacking, I reach several other constitutional arguments raised by plaintiff.

## I.

The majority holds that the superior court improperly construed the language of 21 V.S.A. § 601(12)(L) when it found that Norwich University's purchase of workers' compensation for the Fire Brigade members constituted a valid election for coverage under 21 V.S.A. § 601(12)(L). 21 V.S.A. § 601(12)(L) provides that private volunteer firefighters are covered by workers' compensation so long as there was "[an] election by the organization to have its members covered." Plaintiff argues that the Norwich University Fire Brigade itself is the "organization" and that because members of the Fire Brigade did not elect to be covered by workers' compensation, there was no "election" by the "organization" as the statute requires.

When reviewing that statute as a whole, *State v. Lynch*, 137 Vt. 607, 613, 409 A.2d 1001, 1005 (1979), I find that Norwich University, and not the Brigade itself, is the "organization" for the purpose of 21 V.S.A. § 601(12). In neighboring provisions to § (12)(L) the Legislature explicitly provides for the governing officials of each "organization" to make the election to have workers' compensation cover its members. Specifically, § 601(12)(J) and (K) set out when certain other organizations may elect to be covered by workers' compensation. It provides:

> (12)(J) volunteer reserve police officers . . . when the selectmen or trustees vote to have those officers covered . . . .

> (12)(K) other municipal workers, including volunteer fire fighters . . . after the governing officials of such municipal body so vote . . . .

These provisions enable specific volunteer organizations to be covered by workers' compensation when the "trustees," or "governing officials" "vote" or "elect." These provisions demonstrate that, for the purpose of 21 V.S.A. § 601(12)(L), the "organization" entitled to elect workers' compensation is not the volunteer membership themselves, but the overseeing body, which, in this case, is Norwich University.[1] Accordingly, the su-

---

[1] The majority suggests that it is unreasonable to have a workers' compensation scheme whereby the employer can elect for the employee to be covered.

perior court's determination that Norwich University's purchase of workers' compensation coverage for the Fire Brigade members was an "election" by the appropriate "organization" within the meaning of § 601(12)(L).[2] Even though the word "organization" is broad and, therefore, somewhat ambiguous, a liberal construction of the Act mandates this conclusion to accommodate its beneficial purpose.

## II.

The majority points to the benefit provisions of the statute, 21 V.S.A. §§ 642, 645, 650(a), to demonstrate that plaintiff is not entitled to compensation for his lost wages under the statute. Although there is no specific statutory provision for payment of lost wages for an employee in plaintiff's position, the guidelines issued by the Department of Labor and Industry provide an adequate remedy for people in plaintiff's situation. Cf. *Vogt v. Borough of Belmar*, 14 N.J. 195, 207, 101 A.2d 849, 855 (1954).

Guidelines published by the Department of Labor and Industry provide a means by which plaintiff can be compensated for lost wages. Specifically, the guidelines allow plaintiff to receive compensation calculated on the average weekly wage of a firefighter in the same district. In addition, under the Act plaintiff will be entitled to lifetime medical expenses associated with his injuries. Although the actual determination of benefits is not

---

However, compulsory workers' compensation is common in many states. Cf. Col. Rev. Stat. §§ 8-41-106(1)(a)(I)(A), 8-41-105(5), 8-43-104 (when employer purchases workers' compensation insurance it is compulsory on employee); 1C A. Larson, Workmen's Compensation Law § 56.10, at 9-267 (1983) (about forty-eight state workers' compensation statutes are compulsory as to some or all public employees), and courts in other jurisdictions have upheld such schemes. See *Sullivan v. City of Butte*, 117 Mont. 215, 217–18, 157 P.2d 479, 481 (1945) (referring to Mont. Rev. Code § 2840).

[2] The majority attempts to distinguish provisions (J) and (K) from (L) by referring to the sovereign immunity of the municipality as the basis for this distinction. Nothing that the majority states, however, demonstrates that the intent of the Legislature was to empower the governing officials to elect workers' compensation coverage only where sovereign immunity would otherwise deprive the injured of a remedy. Given the unique structure of the present organization, I find this rationalization by the majority to be an inappropriate exercise in separating form from function. See *Vogt v. Borough of Belmar*, 14 N.J. 195, 101 A.2d 849 (1954).

presently before us, I conclude that the Act and guidelines provide an adequate remedy for plaintiff's injury.

Finally, I note that plaintiff is not barred from pursuing a remedy against the alleged tortfeasor (defendant Yudichak) for causing his injury. 21 V.S.A. §§ 622, 624. Because plaintiff will be adequately compensated by the Act, and since he may pursue a remedy at law, no constitutional violation exists. See Vt. Const. Ch. I, Art. 4 (guarantee of a remedy for every wrong).

## III.

Plaintiff claims that 21 V.S.A. § 601(12)(L), which defines volunteers as public employees for the purpose of workers' compensation, violates Chapter II, § 70 of the Vermont Constitution. Section 70 provides:

> The General Assembly may pass laws compelling compensation for injuries received by employees in the course of their employment . . . . It may designate the class or classes of employers and employees to which such laws shall apply.

Plaintiff asserts that this constitutional provision addressing employees cannot be extended by legislation to include volunteers. He argues that because he was an unpaid volunteer worker, he cannot be designated an employee, and that he was, therefore, not covered by workers' compensation. I would reach this argument and disagree.

Employee is defined by Ballentine's Law Dictionary as "[a]n expression more euphonious than 'servant' but ordinarily meaning the same. One who is in such a relation to another person that the latter may control the work of the former and direct the manner in which it shall be done." Ballentine's Law Dictionary 399 (3d ed. 1969) (citations omitted).

Other states have found that the test for determining the existence of an employer/employee relationship under the Workers' Compensation Act is the same as common-law rules for ascertaining relation of master and servant. *Brady v. Ralph Parsons Co.*, 308 Md. 486, 499, 520 A.2d 717, 724 (1987). Specifically, an employer/employee relationship must be characterized by such elements as the employer's supervisory power, his

right to control the activities of the employee, his right to terminate the relationship, his payment to the employee of regular wages, and his provision of equipment and facilities. *Kalnas v. Layne of New York Co.*, 173 N.J. Super. 492, 497, 414 A.2d 607, 609 (1980). However, I find nothing to suggest that each and every one of these elements must be present in every case.

Here, enough of the elements of an employer/employee relationship are present to demonstrate the existence of such relationship in this case. Plaintiff's activities as a member of the Fire Brigade were controlled by defendant. Defendant had the right to terminate plaintiff's membership in the Fire Brigade. Defendant owned the equipment, provided the facilities, and funded the Brigade. Although there is no payment of wages, I would hold that the combination of the above factors sufficiently establish the existence of an employer/employee relationship between Norwich and plaintiff.

Other jurisdictions have treated volunteer firefighters as employees for the purpose of workers' compensation. The Pennsylvania Supreme Court has found that because a volunteer firefighter was injured while performing his duties as a fireman, he was within the provisions of their Workmen's Compensation Act. *Brinker v. City of Greensburg*, 409 Pa. 110, 113, 185 A.2d 593, 594 (1962); see 77 Pa. Stat. Ann. § 1031(a)(1) (Purdon 1988); Col. Rev. Stat. § 8-41-106(1)(a)(I)(A) (1986); N.H. Rev. Stat. Ann. § 281:2(IV) (1987). The absence of wages did not alter the result.

I conclude that sufficient elements of an employer/employee relationship are present, and that, consequently, the characterization of plaintiff as an "employee" does not offend Chapter II, § 70 of the Vermont Constitution.

## IV.

Lastly, plaintiff argues that the Act, as applied to him, violates the equal protection provision of the United States Constitution and the Vermont Constitution. First, I note that "[a]lmost all regulatory legislation . . . tends to be uneven in its impact." *State v. Ludlow Supermarkets, Inc.*, 141 Vt. 261, 265, 448 A.2d 791, 793 (1982). In Vermont, the language of Chapter I,

Article 7 of the Vermont Constitution allows statutes to have an uneven impact "if the underlying policy supporting the regulation is a compelling one, and the unbalanced impact is, as a practical matter, a necessary consequence of the most reasonable way of implementing that policy." *Id.* The federal constitutional rule is more lenient; the federal standard will uphold the classification if the state law can be justified in any rational way. *Id.* at 268, 448 A.2d at 795.

Both analyses begin with identifying the uneven impact of the law. The classification then must be viewed in relation to the policy behind the law creating the inequity. Here, I need not proceed past the initial exercise of identifying the uneven impact. As discussed above, the Act and the guidelines issued by the Department of Labor and Industry provide for an average wage to be calculated for *both* unemployed and employed volunteer firefighters. Thus, this law does not apply unevenly, and no equal protection problem exists.

I conclude that plaintiff is covered by workers' compensation and 21 V.S.A. § 622 bars plaintiff's suit against Norwich University.

### On Motion for Reargument

**Per Curiam.** On motion for reargument, petitioner Norwich University seeks a declaration that the decision in this matter was issued by an improperly constituted Court and is therefore void. We disagree and deny the motion for reargument.

The principal basis for petitioner's motion is the inclusion among the deciding justices of Hon. Frank G. Mahady, who was appointed to the Court on April 20, 1987, heard oral argument on the case in the September, 1987 Term, and resigned before the Court's opinion issued on April 14, 1989. Since Justice Mahady's resignation preceded Senate confirmation of his interim appointment, petitioner contends that his power to act ceased immediately on resignation under Chapter II, § 33 of the Vermont Constitution,[1] and all subsequent acts, including participation in the Court's decision, were void.

---

[1] Section 33 provides in relevant part:

> A justice or judge so appointed shall hold office, with all the powers incident to the office, until the Senate convenes and acts upon the appoint-

■ It has long been the practice of this Court that a justice who resigns or retires from this Court after hearing a matter may participate fully in consideration of the case thereafter. This practice is grounded in the Court's inherent judicial and administrative powers as found in the Vermont Constitution, Chapter II, § 30. It conflicts neither with the Governor's power to appoint nor with the Senate's power to confirm, and relates strictly and narrowly to the Court's inherent power to complete in succeeding terms what was begun in earlier ones. See, e.g., *St. John v. O'Reilly*, 80 Idaho 429, 434, 333 P.2d 467, 470 (1958). This power is critical to a Court with such a high caseload that cases sometimes take a year or more for an opinion to be written. The consequence of petitioner's argument is that the most difficult cases presented to this Court—those on which members of the Court have differing views—are always at risk of continuous indecision and reargument.[2] We do not believe that we can function effectively to discharge our constitutional responsibilities under such circumstances.

■ Petitioner does not attack this policy in general, but argues that it should not apply to a justice under interim appointment only and not yet confirmed by the Senate. We find nothing in the Constitution to establish a class of justices with different and diminished powers and prerogatives from those who have been confirmed by the Senate. Under Chapter II, § 33 a justice given an interim appointment enjoys "all the powers incident to the office" while serving. The conclusion is inescapable, and we hold, that the authority of a justice who has sat at the hearing of a case to complete work on that matter is fixed by the status of

_____

ment submitted by the Governor. Thereafter, the appointee shall continue in office if the Senate consents to the appointment. If the appointment is not confirmed upon vote of the Senate, the appointment shall be terminated and a vacancy in the office will be created.

[2] Petitioner argues that the effect of its motion will be to disqualify Justice Mahady from the case, leaving an equally divided Court. Since the Court is equally divided, petitioner asserts that the lower court decision will be affirmed. In fact, the result of an equally divided Court under our custom is to reargue the case before a full complement of justices. Thus, the granting of petitioner's motion would lead only to reargument of the case and another delay, with an uncertain decision.

the justice on the hearing date. Subsequent resignation or retirement does not change this authority. Such a justice does not merely serve de facto, as respondent suggests,[3] but functions under authority "incident to the office" which the justice holds until departing the Court, for the limited purposes we have described.

Although petitioner argues from the constitutional provisions, it relies on the limitations in certain statutes which it believes support its position. It argues that 4 V.S.A. § 5(a), which deals with concluding cases heard during the term of office of a justice or judge, does not apply and, therefore, that there is no power for District Judge Mahady to decide this case.[4] It concedes that the Chief Justice could have appointed District Judge Mahady to continue to sit under 4 V.S.A. § 22, but argues that the Chief Justice failed to do so.

■ We do not believe it is necessary to plunge fully into the confusing and overlapping statutes in this area to decide this motion. We conclude that the power to decide when to include former Justices in the composition of this Court is a judicial power that does not belong to the legislative branch of government and cannot be exercised by it. Vermont Constitution, Chapter II, § 5. As we noted recently in *Ketcham v. Lehner*, 149 Vt. 314, 317, 542 A.2d 290, 292 (1988), the power of judicial assignment resides in the judicial branch under Chapter II, § 30 of the Vermont Constitution. *Ketcham* follows the mandate of *Granai v. Witters*, 123 Vt. 468, 471, 194 A.2d 391, 392 (1963), which struck down a statute giving parties represented by lawyers serving in the General Assembly an automatic continuance

---

[3] The de facto doctrine is generally aimed at validating the acts of a judge sitting without authority. See, e.g., *Meeker v. Reed*, 70 Cal. App. 119, 123, 232 P. 760, 762 (1924); *Brunswick Village v. Knof*, 29 N.J. Super. 238, 241, 102 A.2d 383, 384 (1954).

[4] Both parties argue from 4 V.S.A. § 5(a) but ignore 4 V.S.A. § 75, which covers the powers of a justice on "vacation of office." It allows a justice to "conclude causes partly or fully heard before him." The statute is codified, however, in chapter 3 of Title 4, which deals with superior judges and superior court and may have been intended to cover Supreme Court Justices while sitting in superior court. While we believe the statute by its terms applies to the situation here, we prefer to base our decision on the inherent powers of the judicial branch.

during the legislative session. We found that the statute might "result in unjustifiable delay in the disposition of cases so affected" and, thus, intruded "into the internal administration reserved unto the judiciary."

Although it is difficult to draw clear lines in separating the powers of the co-equal branches, and there must necessarily be some overlap of powers, the "co-equal independent Judiciary must possess rights and powers co-equal with its functions and duties, including the right and power to protect itself against any impairment thereof." *Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 52, 274 A.2d 193, 197 (1971). The judiciary must control the "management of the courts" to fulfill its function of providing justice to those who appear before us. See *State ex rel. Thompson v. Day*, 200 Minn. 77, 82, 273 N.W. 684, 686 (1937). We do not believe that we provide justice to the litigants by starting anew on a case that is now five years old and has never reached the merits.

We write briefly about the impediments contained in the existing statutes because they demonstrate why we must assert judicial control over the composition of the Court. 4 V.S.A. § 5(a) purports to allow a member of the Court who sits on a case and thereafter retires to conclude work on the case "only to the following term of court." A durational limit on service may have made sense when the workload of the Court was far less than today and terms were longer. We now have eight terms, Administrative Order No. 21, § 1, and carry workloads such that it is many months before we can conclude work on all cases on which we sit. The durational limit of § 5(a) makes the authorization to continue after retirement illusory and could cause a substantial number of cases to be reargued if it were applied by this Court.

4 V.S.A. § 22 authorizes the Chief Justice to specially assign judges to this Court and petitioner concedes that the Chief Justice could assign District Judge Mahady to this Court for the purpose of this case. We think it wholly inappropriate to have the Chief Justice or this Court as a whole make, or withhold, special assignment of justices who have sat at argument and already made known their views. The assignment decision would, in effect, decide the case. We would not discharge our

responsibility to provide "justice . . . impartially administered" if we decided cases by assignment decisions. See Vermont Constitution, Chapter II, § 28. Any policy on composition of this Court must not involve a discretionary assignment that will knowingly determine the outcome.

■ The only policy that is consistent with the responsibilities and duties of this Court under the Vermont Constitution is that the justices who sat according to law when a case is argued will participate in the decision even though they are no longer members of the Court on the date the decision is signed. Accordingly, District Judge Mahady properly participated in the decision in this case.

■ Petitioner's second ground in support of its motion is that the majority opinion neglected to consider evidence that the Brigade, as a member of the Capitol Fire Mutual Aid System, had effectively elected to have its members covered by Workers' Compensation Insurance. This argument is not only a new one, but it appears to conflict with the election theory in petitioner's brief in chief. Consequently it is not a proper matter to be advanced in support of a motion for reargument under V.R.A.P. 40. *Champlain Valley Exposition, Inc. v. Village of Essex Junction*, 131 Vt. 449, 457, 309 A.2d 25, 30 (1973).

*The motion for reargument is denied.*