926 A.2d 626 (2007)
2007 VT 26
STATE of Vermont
v.
Larry WOOLBERT.
No. 05-339.
Supreme Court of Vermont.
April 2, 2007.
Motion for Reargument Denied May 2, 2007.
Present: REIBER, C.J., and DOOLEY, JOHNSON, SKOGLUND and BURGESS, JJ.

ENTRY ORDER
¶ 1. Defendant appeals an order of the trial court that he engaged in "violent or threatening behavior" contrary to his conditions of probation. Additionally, defendant argues that the trial court did not have the authority to modify both the "to *627 serve" portion of defendant's sentence and the conditions of his probation. We affirm.
¶ 2. In 2004, defendant pleaded guilty to sexual assault on a minor and was sentenced to serve eight to twelve years with all but fourteen months of the sentence suspended. As part of his sentence, defendant was placed on probation, which applied while he was incarcerated. In March 2005, the State filed a probation violation complaint, alleging that defendant had engaged in "[v]iolent [or] threatening behavior" contrary to his probationary terms.
¶ 3. Following a hearing, the district court found that defendant had violated a condition of probation prohibiting "violent or threatening behavior." The court revoked defendant's probation and increased defendant's time to serve to forty-four months. The court reimposed probation and added two additional conditions: that defendant successfully complete sex-offender treatment while incarcerated and that he not incur any major disciplinary reports (DRs).
¶ 4. At the hearing, the State presented the following evidence of a February 2005 incident from which two DRs arose: testimony of a witness to the incident, testimony of the hearing officer for the incident, and a videotape of the incident. Of the two DRs defendant received, one was for assault. The State's probation violation complaint for "violent or threatening behavior" arose from the report for assault.[1]
¶ 5. The living unit supervisor, Lynn Roberto, described the February 2005 incident as follows. Defendant and three other inmates refused to turn in their bed sheets for laundering. After being warned that they would be disciplined, the three other inmates complied. Defendant, however, continued to refuse, and barricaded himself in his cell with his mattress and sheets piled up against the door. This conduct resulted in a verbal confrontation with two guards during which defendant threw his sheets at the officers. Due to his refusal to cooperate, the officers decided to transfer him to another unit. Defendant thereafter refused to leave his cell. He was profane, disruptive, and physically resistant throughout this process (referred to as a "cell extraction"), and had to be restrained. Supervisor Roberto testified that defendant "was yelling, he was screaming, [and] he was trying to kick" during the extraction. For this reason, two additional officers were called in for back-up; ultimately it took four officers to restrain defendant using a "restraint chair."
¶ 6. The State next called Supervisor Mark Boutanis, who served as the hearing officer for the February 2005 incident. Supervisor Boutanis testified that during the extraction defendant kicked and injured another supervisor.
¶ 7. In addition to this testimony, the district court viewed a videotape of the entire cell extraction. The tape depicts an altercation spanning some seven to ten minutes in which defendant engages in numerous outbursts of physical resistance, interrupted by quiet periods in which he is held in physical check while additional guards are called. Based on all the evidence, *628 the district court found that defendant had been "assaultive and violent" in the course of being unreasonably reactive and resistant when asked to turn over his bed sheets. Noting that defendant had, among other things, kicked an officer, the court concluded that the State had met its burden. On appeal, defendant argues that while his conduct was noncompliant, it was not "violent or threatening" such that he violated his probation.
¶ 8. The district court's conclusion that defendant violated his probation presents a mixed question of law and fact. State v. Austin, 165 Vt. 389, 398, 685 A.2d 1076, 1082 (1996). We have recognized that in establishing a violation of probation the trial court must first make a factual determination of the probationer's actions, and then make an "implicit legal conclusion" that the probationer's actions violated his probationary terms. Id. If supported by credible evidence, the trial court's factual findings must stand. Id. If supported by its findings, the court's legal conclusions must also stand. Id.
¶ 9. The district court's finding that defendant was violent and assaultive during an incident in which he kicked an officer is supported by the evidence. Trial courts are in a unique position to assess the credibility of witnesses. Begins v. Begins, 168 Vt. 298, 301, 721 A.2d 469, 471 (1998). It is not our role to second-guess a court's decision as to whom to believe; rather, our duty is to ensure that the court's findings are supported by the evidence. Here, the evidence of defendant's behavior during his escalating resistance to direct ordersincluding testimony that he kicked an officersupports the factual and legal determination that he was "violent or threatening." Unlike the concurrence, we are not persuaded that the videotape of defendant's ongoing resistance, including his repeated attempts to kick and writhe free of the guards, significantly contradicts the testimony relied on by the trial court and summarized herein. The record in this case, taken as a whole, supports the conclusion that this was an instance of substantial and repeated physical force beyond mere yelling or intimidating behavior. Cf. State v. Lee, No.2000-062, slip op. at 2, 172 Vt. 639, 772 A.2d 150 (Vt. Mar. 28, 2001) (unreported mem.) (finding defendant had not violated his conditions of probation when he followed and frightened his former partner in public).
¶ 10. Defendant's second argument is that the court did not have the authority, after revoking his probation, to both increase the portion of his sentence to serve and reimpose his probation with added conditions. Defendant argues that although the power to take each of these actions is granted by separate subsections of 28 V.S.A. § 304(b), the powers are not cumulative because the statute uses the word "or" after each. We find no reason why the powers contained in § 304(b) must be mutually exclusive. In any event, as the State points out, the court's authority to add probation conditions is also granted by 28 V.S.A. § 253(a), and there is no indication in that section that it cannot be used along with other powers. We conclude that the court was within its authority to impose the sentence it did.
Affirmed.
SKOGLUND, J., concurring.
¶ 11. I concur in the result because the evidence does support a finding that defendant exhibited threatening and violent behavior. However, I do not believe credible evidence supports a finding that defendant demonstrated threatening or violent behavior during the event relied upon by the majority, and so I write separately to explain *629 my disagreement with that holding and my concerns with the evidence.
¶ 12. In this case, the majority relies on "violent or threatening behavior" by defendant while four guards forcibly extracted him from his cell and transferred him to another unit because he had disobeyed a rule regarding the laundering of bed sheets. I agree that the defendant was verbally resistant to orders, causing a guard to threaten him with chemical spray before defendant went down on his knees, placed his forehead against the wall, and put his hands behind his back to be handcuffed. During the course of the cell extraction, defendant apparently kicked an officer and struggled against the four officers transporting him. While defendant is clearly responsible for his physical and verbal defiance in this situation, I ask who was threatened, and was his resistance actually violent behavior? I believe the line between noncompliance with institutional regulations and correctional staff what the witnesses termed not being a "good inmate"and "violent or threatening behavior" justifying the revocation of probation is not clearly delineated by either the trial court or the majority opinion.
¶13. To be charged with violating probation, a probationer must be told, when probation is imposed, what circumstances will constitute a violation. State v. Hammond, 172 Vt. 601, 602, 779 A.2d 73, 75 (2001) (mem.) ("[D]efendant is entitled to know what conduct is forbidden before the initiation of a probation revocation proceeding." (quotations omitted)). "`[D]ue process requires that a convicted offender be given fair notice as to what acts may constitute a violation of his probation, thereby subjecting him to loss of liberty.'" State v. Austin, 165 Vt. 389, 398, 685 A.2d 1076, 1082 (1996) (quoting State v. Peck, 149 Vt. 617, 619, 547 A.2d 1329, 1331 (1988)). Here, defendant was told that violent or threatening behavior would violate his probation contract. The correctional witnesses testified that defendant's behavior was threatening because it disrupted the orderly operation of the correctional facility. As this case demonstrates, an explanation of when an act of disobedience or noncompliance with prison rules will be considered an act of aggression properly characterized as "violent or threatening behavior" was necessary.
¶ 14. The State charged defendant with violating his probation by receiving at least fourteen DRs in thirteen months, including DRs for "assault, disruptive behavior, agitating, provoking, failure to abide, and improper hygiene." One of these was the February 28 incident that began with a dispute over laundry, which I will discuss later. I begin with the one incident that I believe does support a violation of probation finding because it demonstrated violent and threatening behavior.
¶ 15. At the hearing, correctional facility shift supervisor Boutanis testified to an incident that resulted in a DR for defendant. On September 7, 2004, defendant had been issued a DR for failure to stand for a head count, as a facility rule required. When told of the DR, defendant became enraged, slammed the duress button on the podium of the officer in charge, picked up a wooden cribbage board and started flailing with it, in the process striking the podium hard enough to damage it. This so-called podium is not to be confused with a lectern. The officer's podium is the workstation from which he or she maintains electronic control of the area. It holds the video monitoring security equipment, a safe for deposit of inmate funds, forms and other administrative materials. It also holds the duress button, a major security feature of the facility. Pushing the duress button indicates that an officer is in danger and needs immediate assistance. *630 When pushed, an emergency-response call goes out for everyone available in the correctional center to respond. Supervisor Boutanis testified that defendant's actions resulted in "mass confusion" in the facility, as another duress alarm had sounded in another location at the same time. "We were responding to two different locations because we weren't sure who was in danger. We ended up locking down the facility." Boutanis also testified that the defendant's actions were "severely threatening" to the officer involved.
¶ 16. When defendant returned to his cell, he kicked the door and slammed his hand repeatedly into the window, drawing blood. This resulted in another DR for defendant. It also was a basis for the finding by the trial court that defendant had violated his probation by engaging in violent and threatening behavior.
¶ 17. I agree that defendant was violent and threatening during this incident. He did not merely disrupt the orderly administration of the correctional facility. Defendant's aggressive, threatening, violent behavior jeopardized the safety of the officer at the podium and others in the institution. I would affirm the court on the basis of this event.
¶ 18. However, I see a difference between the actions of the defendant that caused destruction, chaos and danger and those that were merely noncompliant with rules. How threatening can a man be when he is handcuffed and physically restrained by four guards in a secure prison setting? Is a trip or kick an act of violence if it occurs while the defendant, in handcuffs, struggles momentarily while held between two guards? Was that what the court intended when it imposed the condition of probation prohibiting threatening or violent behavior? Did anyone inform defendant?
¶ 19. These questions lead me to my second, more perplexing problem. I respectfully suggest that the court's findings, which the majority adopts, are not supported by the evidence. As the majority notes, whether defendant violated this condition of his probation is a mixed question of law and fact. Austin, 165 Vt. at 398, 685 A.2d at 1082. We review the district court's factual findings with deference, but the characterization of those actionsthe ultimate determination of whether defendant's actions violated the conditions of his probationis a question of law. Id. (decision whether probationer's actions violated his probationary terms is an "implicit legal conclusion").
¶ 20. The district court was presented with two forms of evidence concerning the February 2005 incident upon which the majority relies in upholding the revocation of probation: the testimony of a member of the correctional staff and a videotape of the February 2005 incident. There is a significant disparity between what the fact witness testified to and what appears on a videotape of the event.
¶ 21. Lynn Roberto, the living unit supervisor at the facility, testified that defendant had received a number of DRs during his time at the correctional facility for behavior that was "not conducive to the smooth running of the facility." In summarizing defendant's history of disciplinary reports, Roberto noted that there were "numerous reports for disruptive behavior, for failing to abide [by] facility rules." She also testified, however, that, in general, defendant was "actually very quiet" and did not get into altercations with other inmates.
¶ 22. In describing the events of February 28, Supervisor Roberto repeatedly characterized defendant's behavior as "noncompliant" and "totally uncooperative." Roberto acknowledged that defendant's *631 refusal to hand over his sheets was a "minor incident" that escalated: "[I]f he was compliant, . . . we wouldn't even have had to do [the cell extraction], . . . yes, it seems like a little incident that really got out of hand." She testified that after defendant threw his sheets out the door, it was decided he would be moved for noncompliance. When additional guards came to remove defendant from his cell, the situation escalated. She testified that two officers were holding defendant up against the wall "because he was yelling, he was screaming, he was trying to kick." She further testified that during the incident he was "placed on the floor because he was punching and screaming and kicking."
¶ 23. She also testified that she was not on the second floor by defendant's cell when the event was happening. She was on the first floor, observing from afar. I suggest that, from that position, it would be very difficult to see what behavior caused defendant to be held against the wall, for example.
¶ 24. Beyond the question of her ability to observe the event, review of the videotape does not support her testimony. The video shows no yelling, no screaming, and significantly, no punching. This is not surprising given that defendant's hands were handcuffed behind him before he left the cell. The defendant's resistance consists of him repeatedly asking "why" and cursing when told he was being moved from his cell to another unit. During the event, defendant utters one profanity and, on one occasion, appears to try to kick or trip a guard. As noted, he does appear to writhe when being hauled down the stairs by four guards, each holding one appendage, and he resists being shackled into the restraining chair by stiffening his body.
¶ 25. The court assessed the videotape evidence as follows: "Mr. Woolbert, by body language and by explicit verbal responses was anything but compliant. . . . [The correctional personnel] were confronted with a prisoner who had taken a very minor incident and blown it into a major piece of resistance and there was no way that Mr. Woolbert was going to become compliant without a show of force."[2]
¶ 26. We have held that the availability of a videotape of the underlying events for review on appeal does not change our standard of review regarding the trial court's factual findings. In re Duckman, 2006 VT 23, ¶ 20 n. 5, 179 Vt. 467, 898 A.2d 734 (availability of videotape of hearing does not change our standard of review). However, where irrefutable evidence, a videotape, conflicts with a witness' recollection, the tape should take precedence. In Carmouche v. State, 10 S.W.3d 323 (Tex.Crim. App.2000), the Texas Court of Criminal Appeals reviewed the question of whether a defendant's consent to a search of his person was free and voluntary. The court of appeals found, after viewing a videotape of the event, that consent was not given at all. Id. at 332. Noting the general rule that appellate courts should give "`almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's findings are based on an evaluation of credibility and demeanor,'" the court in Carmouche reasoned that the nature of the evidence presented in the videotape did not pivot on an evaluation of credibility or demeanor. Id. (quoting Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997)). Rather, it wrote, "the videotape presents indisputable visual evidence contradicting essential portions of [the officer's] testimony. In these narrow circumstances, *632 we cannot blind ourselves to the videotape evidence simply because [the officer's] testimony may, by itself, be read to support the [court's] holding." Id.; see also Herrera v. State, 194 S.W.3d 656, 658 (Tex.App.2006) ("Like our sister courts and the Court of Criminal Appeals, we do not turn a blind eye to the videotape.").
¶ 27. In this case, the videotape of the event refutes Roberto's description of the defendant's behavior during the cell extraction. Assessing all of the evidence as a whole, and giving proper weight to the videotape evidencewhich the district court emphasized was the "best evidence" of what occurred that dayI would not find defendant's behavior during the cell extraction to be violent or threatening. He may have attempted a kick. He was certainly not "punching and screaming." In short, the testimonial and videotape evidence established that on February 28 defendant was "difficult . . . to manage," that his behavior was "not conducive to the smooth running of the facility" and "not consistent with a good inmate."
¶ 28. Shift supervisor Boutanis also testified concerning the February 28 incident. Supervisor Boutanis was not present during the February 28 incident. He was the hearing officer assigned to decide the DR that arose from that event. He testified that, after speaking with defendant, they reached an informal resolution after defendant admitted that his behavior during the incident was "inappropriate." Somehow, this testimony found its way into the court's finding as follows: "Mr. Woolbert acknowledged that his behavior was both assaultive and inappropriate, as it was. The court concludes that that admission itself was sufficient to carry the state's burden in this case." Again, this finding is not supported by the evidence.
¶ 29. On February 28 defendant was inappropriate, noncompliant and exhibited behavior not consistent with a good inmate. I do not believe he was threatening or violent. If he was, as the majority finds, then probationers need to be informed that behaviors that are not conducive to the smooth running of the correctional facility can constitute "threatening and violent behavior" sufficient to violate their probation.
NOTES
[1] Additionally, the State presented evidence of other "violent or threatening" incidents from May 2004 and September 2004 in support of its complaint. The May incident involved the kicking and slamming of a door, and an alleged attempt to trip two officers as they were walking. The September incident involved the pushing of a panic button and hitting a piece of furniture with a cribbage board. Because we find that the evidence of the February 2005 incident was sufficient to sustain the State's complaint, we do not address the other incidents.
[2] I agree with the court's assessment that "the correctional personnel were remarkably patient" and that they "applied the minimum force necessary to secure compliance."