NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 19

No. 2020-306

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Orleans Unit, |
| | Criminal Division |
| | |
| Michael Sinquell-Gainey and David Vaz | September Term, 2021 |

Robert R. Bent, J.

Jennifer Barrett, Orleans County State's Attorney, and Michael A. Cricchi and Farzana Leyva, Deputy State's Attorneys, Newport, for Plaintiff-Appellant.

Matthew Valerio, Defender General, and Rebecca Turner, Appellate Defender, Montpelier, for Defendant-Appellee Sinquell-Gainey.

Zachery D. Weight of Burke Law, P.C., Burlington, for Defendant Appellee Vaz.

PRESENT:  Reiber, C.J., Robinson,[1] Eaton, Carroll and Cohen, JJ., Dooley, J. (Ret.),
Specially Assigned

¶ 1.  **CARROLL, J.**  The State appeals from a trial court order granting defendants' motion to suppress evidence obtained by law enforcement after an automobile stop.  The State argues that a Newport police officer had reasonable suspicion to stop defendants because he observed a traffic violation and because the totality of the circumstances supported reasonable suspicion of impaired driving.  We agree that the stop was justified based on reasonable suspicion of impairment.  We therefore reverse and remand.

---

[1]  Justice Robinson was present for oral argument but did not participate in this decision.

¶ 2.    The following facts were adduced during two suppression-motion hearings.  At about 1:40 a.m. on March 24, 2018, defendants Michael Sinquell-Gainey and David Vaz were in a vehicle that pulled into a gas station in Newport, Vermont.  At that moment, Newport Police Officer James LeClair was parked in his police cruiser next to U.S. Border Patrol Agent John Marquissee in a vacant lot near the gas station.  Two other Newport police officers, patrolling in a single cruiser, were also parked next to Officer LeClair and Marquissee.  The officers were having a conversation, as they often did when working the night shift.  In his rearview mirror, Officer LeClair noticed defendants pull into the gas station through an exit-only access.  He watched defendants drive past a set of gas pumps, circle around, and return to park next to the first set of pumps.  Officer LeClair turned back to his conversation with the others.  He testified that he could not recall how long defendants' vehicle remained at the gas pumps, or whether defendants actually pumped gas.

¶ 3.    When defendants left the gas station a few moments later, Officer LeClair followed. He testified that he initially followed defendants because the bars had recently closed, and defendants had entered the gas station through an exit.  At all times during the encounter, defendants were travelling two to three miles per hour under the speed limit.  Furthermore, the trial court found that Officer LeClair could not discern the identities of the occupants of the vehicle until later when he approached defendants during the traffic stop on Interstate 91.

¶ 4.    Defendants, with Officer LeClair following, came to an intersection controlled by a flashing yellow light for traffic approaching from their direction, and by a flashing red light for cross-traffic.  Flashing yellow lights indicate that traffic must slow and proceed with caution; flashing red lights indicate that traffic must come to a complete stop before proceeding.  23 V.S.A. § 1024(a).  Officer LeClair testified that the operator activated the left turn signal shortly before reaching the intersection.  See 23 V.S.A. § 1064(d).  He also testified that the driver "stopped for quite some time," even though no stop was required.

¶ 5.      After stopping, the operator turned left onto an access road heading toward Interstate 91.  The vehicle's left turn onto the access road swung wide enough that the vehicle crossed the fog line and traveled close to the guardrails for an appreciable distance.  Officer LeClair described the distance between the vehicle and the centerline as "almost a full—half to a full car length."  The operator traveled up the access road like this until the one-lane access road became two lanes, at which point the vehicle remained in the right lane, all the while driving just below the speed limit.

¶ 6.      As the vehicle approached the entrance to the southbound lanes of Interstate 91, the operator briefly activated the vehicle's high beams before deactivating them and signaling a right turn onto the interstate.  The vehicle turned right, up the onramp, and onto Interstate 91.  Officer LeClair followed.  The vehicles traveled a short distance in the right lane before defendants' car drifted to the left side of the lane.  Officer LeClair testified that he saw the driver-side tires cross the centerline.[2]  He activated his blue lights a few seconds later, at which point the cruiser's dash-mounted camera automatically began recording.  As a result of a "look back" feature of the dash-mounted camera that begins the video recording thirty seconds before the lights are activated, the camera captured all the events on the interstate but did not record anything before that point.  The operator pulled over without incident.

¶ 7.      A few seconds after Officer LeClair stopped behind defendants, Agent Marquissee arrived.  Officer LeClair and Marquissee had a brief conversation that was not recorded.  He then approached the driver, while Marquissee started toward the passenger side.  Officer LeClair immediately asked the driver whether he had been drinking.  The driver, who Officer LeClair learned was Sinquell-Gainey, said he had not.  Officer LeClair explained that he pulled defendants

_____

[2] The centerline, in this case, is the intermittent white line indicating the boundary between the right lane and the left lane on the interstate.

3

over because they had swung wide on the left turn earlier, and that they had "crossed" the centerline on the interstate.

¶ 8. Meanwhile, Marquissee, without speaking with the passenger, returned to his truck to retrieve a K-9 trained to detect drugs. Marquissee walked the dog around defendants' vehicle. The dog alerted to the possible presence of drugs. Separately, Officer LeClair testified that he detected an odor of unburned marijuana when he spoke with defendants. Officer LeClair asked defendants about the odor, and they told him they had smoked marijuana earlier in the day. Officer LeClair then asked Sinquell-Gainey if he would consent to a search of the car based on the odor of marijuana and the K-9 alert to the presence of drugs. Sinquell-Gainey initially agreed and signed a consent card authorizing the search. During the search, Officer LeClair observed five cell phones in the console area of the car and a white powdery substance in the trunk. However, before Officer LeClair could locate any identifiable contraband, Sinquell-Gainey revoked his consent to search. Officer LeClair stopped searching and subsequently seized the vehicle.

¶ 9. After obtaining a search warrant, officers found heroin and fentanyl in the engine compartment. Accordingly, Officer LeClair prepared an affidavit of probable cause in support of felony charges[3] relating to drug possession and trafficking, describing the factors that provided him with reasonable suspicion to make the traffic stop. Just as he did when he first approached defendants on Interstate 91, Officer LeClair described the wide left turn and the "crossing" of the centerline as the basis for stopping defendants. In the affidavit, Officer LeClair provided two additional factors: that defendants' vehicle pulled into the gas station through an exit-only access; and that it came to a complete stop at the flashing yellow light. Defendants moved to suppress the

---

[3] Defendants are both charged with possession of heroin, 18 V.S.A. § 4233(a)(4), trafficking of heroin, 18 V.S.A. § 4233(c), trafficking of fentanyl, 18 V.S.A. § 4233a(b), and transporting fentanyl into the state, 18 V.S.A. § 4233a(c). Furthermore, defendant Vaz, the passenger, initially provided a false name when questioned about his identity, could not produce a medical marijuana card he said he had, and did not have identification. Vaz was charged with two additional violations: providing false information to law enforcement, 13 V.S.A. § 1754(a), and obstruction of justice, 13 V.S.A. § 3015.

4

incriminating evidence obtained in the engine compartment, arguing in part that the evidence was obtained following a traffic stop that was not supported by reasonable suspicion.[4]

¶ 10.    The trial court granted defendants' motion.  The court concluded that Officer LeClair did not have reasonable suspicion to make the traffic stop.  Though the court credited his testimony that defendants committed a traffic violation by failing to signal within 100 feet of an intersection pursuant to 23 V.S.A. § 1064(d), the court concluded that the traffic signal violation, to be an objective basis for the traffic stop, "must have been the stated purpose of the stop to establish reasonable suspicion."  Because Officer LeClair had not recited the violation in the probable-cause affidavit, did not disclose the violation to defendants as a reason for the stop, and raised it for the first time at the suppression motion hearing, the court reasoned that the violation could not form the objective basis of the traffic stop.

¶ 11.    As to the purported centerline violation on the interstate, the trial court credited Officer LeClair's dash-mounted camera footage, which showed that defendants' vehicle touched but did not, in fact, cross the centerline.  The court found that Officer LeClair's mistaken observation that the car crossed the centerline was not reasonable because the statute he cited as the basis for the violation, 23 V.S.A. § 1031, driving to right, does not apply on a multi-lane roadway restricted to one-way traffic.  The court reasoned that even if defendants had crossed the centerline, as Officer LeClair testified they did, defendants would have not violated § 1031 because the statute does not apply "upon a roadway restricted to one-way traffic."  Id. § 1031(a)(4).

---

[4] Defendants' briefing discusses the post-stop expansion of the investigation in this case. The expansion of a traffic stop is a separate seizure.  State v. Cunningham, 2008 VT 43, ¶ 30, 183 Vt. 401, 954 A.2d 1290 ("[A] post-stop investigative expansion . . . is an additional seizure under Article 11, and therefore must—like an additional stop—be supported by a reasonable, articulable suspicion of wrongdoing.").  The trial court's order granting defendants' motion to suppress concluded that the stop was not supported by reasonable suspicion and did not address the merits of the post-stop investigatory expansion.  Though we recite post-stop events for context here, the only question before us in this appeal is the validity of the traffic stop.  To the extent defendants raise the post-stop expansion argument on appeal, we decline to review it because the trial court did not decide the issue.  State v. M.W., 2012 VT 66, ¶ 11, 192 Vt. 198, 57 A.3d 696 ("Given no decision on the question[] raised, the matter is not ripe for appeal.").

¶ 12. As to the other observation Officer LeClair cited as a basis for providing reasonable suspicion, the trial court concluded that the wide left turn onto the access road did not constitute a traffic violation. The court opined that the State's failure to explain why the wide left turn constituted a traffic violation raised a "red flag as to the issue of pretext."

¶ 13. Finally, the trial court rejected the State's argument that under a totality-of-the-circumstances analysis, Officer LeClair had reasonable suspicion of the operator's impairment. The court concluded that the entry into the gas station through an exit-only access, the unprovoked stop at the flashing yellow light, the wide left turn onto the access road, and the brief activation of the high beams did not collectively give rise to reasonable suspicion of driving under the influence. The State appealed.

¶ 14. Our review of a grant of a "motion to suppress involves a mixed question of fact and law." State v. Rutter, 2011 VT 13, ¶ 6, 189 Vt. 574, 15 A.3d 132 (mem.). When reviewing the decision to grant a suppression motion, we review a trial court's findings of fact for clear error and its legal conclusions de novo. State v. Pitts, 2009 VT 51, ¶ 6, 186 Vt. 71, 978 A.2d 14.

¶ 15. On appeal, the State argues that under a totality-of-the-circumstances analysis, LeClair had an articulable and particularized suspicion that the operator was driving while impaired. The State also argues that Officer LeClair observed three traffic violations that provided reasonable suspicion to stop defendants—failure to signal under 23 V.S.A. § 1064(d), failure to drive to the right on Interstate 91 under 23 V.S.A. § 1031, and failure to maintain the lane of travel during the wide left turn under 23 V.S.A. § 1038. Defendants counter that the trial court correctly determined that the factors Officer LeClair observed did not support a reasonable suspicion that defendants were driving under the influence, and none of Officer LeClair's observations of potential traffic violations provided reasonable suspicion to stop defendants.

¶ 16. We turn first to the State's argument concerning reasonable suspicion of impaired driving. "[W]e look to the totality of the circumstances in judging the reasonableness of a DUI

6

stop" where a traffic violation does not form the basis of the stop. State v. Marshall, 2010 VT 81, ¶ 8, 188 Vt. 640, 8 A.3d 1086 (mem.). While we review the trial court's conclusions concerning reasonable suspicion without deference, "we nonetheless consider the training and expertise of the officer in drawing inferences from the individual facts and circumstances." State v. Manning, 2015 VT 124, ¶ 15, 200 Vt. 423, 132 A.3d 716; see id. ¶ 14 ("[Officers] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002))); State v. Pratt, 2007 VT 68, ¶ 6, 182 Vt. 165, 932 A.2d 1039 (stating that "we rely on the expertise of the officer in recognizing signs of impaired operation" from "the totality of the circumstances"). Consequently, "courts must avoid a 'divide-and-conquer analysis' that scrutinizes each factor independently and accords no weight to conduct that alone is fairly innocuous." Manning, 2015 VT 124, ¶ 14 (quoting Arvizu, 534 U.S. at 274).

¶ 17.    Given this framework, we conclude that Officer LeClair reasonably drew sufficient "inferences from the individual facts and circumstances" when he decided to pull over defendants for suspicion of impaired driving. The list of factors LeClair observed and drew inferences from that evening is substantial. First, the operator pulled into the gas station through a posted exit.[5] Second, he maintained a reduced speed throughout the entire encounter. Third, LeClair testified that the driver "stopped for quite some time" at an intersection where the traffic signals did not require him to do so. Fourth, he made a wide turn where the vehicle crossed over the fog line, a half to a full car length away from the centerline, traveling close to the guardrails until the single-lane access road became two lanes. Fifth, the operator briefly flashed the car's high beams before

_____

[5] We cannot determine whether the entry into the gas station was a traffic violation based on the evidence in the record. See 23 V.S.A. § 2302 (defining traffic violation). We agree, however, that it is a factor in determining whether there was reasonable suspicion of impaired driving.

7

signaling a right turn to get onto the interstate. Sixth, the bars in the area had closed about forty minutes before LeClair first saw defendants enter the gas station.

¶ 18. We have approved of traffic stops based upon considerably less. For example, in State v. Pratt, we affirmed a denial of a motion to suppress evidence where a state trooper pulled over a car for drifting back and forth within a lane on Interstate 89 for approximately five miles. 2007 VT 68, ¶ 7. It is worth quoting our rationale in Pratt in full:

> Here, the trooper observed [the] defendant drift back and forth within his lane several times over a distance of approximately five miles. [The d]efendant argues that drifting within a lane of traffic is not a traffic violation and, thus, cannot serve as the basis for a stop. We decline to adopt such a bright-line rule. Although we agree that most of our decisions involve instances in which the stop is justified by a violation of a law specifically regulating safe operation or the physical condition of a vehicle, there is no requirement that an officer, having reasonable suspicion of DUI, must also have cause to believe the operator has committed another offense. As discussed above, reasonable suspicion of driving while intoxicated is assessed by examining the totality of the circumstances and consequently may be supported by evidence of erratic driving, whether or not it amounts to a specific traffic violation. Further, we rely on the expertise of the officer in recognizing signs of impaired operation.

Id. ¶ 6.[6]

¶ 19. In State v. Hayes, we affirmed a stop where a police officer witnessed a series of events much like those observed by Officer LeClair in this case—a failure to properly deal with a

---

[6] The dissent contends Pratt is distinguishable from this case because the trial court in Pratt found the officer's "testimony credible and consistent with the video footage" recording the defendant's intra-lane weaving. 2007 VT 68, ¶ 7; post, ¶ 51. Yet, it is not clear that the trial court in Pratt found the officer credible in all respects. The dissent suggests that because the trial court here "called into question" Officer LeClair's credibility, including questioning why LeClair did not activate his dashcam, we cannot rely on LeClair's "expertise" in recognizing signs of impairment where his "credibility is demonstrably lacking." Post, ¶¶ 51-52. However, we do not rely on any fact the trial court did not find credible, and we do not rely on any event the trial court found did not occur. Merely because the court called LeClair's credibility into question in some respects does not render all of the officer's testimony irredeemably tainted on de novo review. Pratt, 2007 VT 68, ¶ 4 ("The question of whether the facts as found met the proper standard to justify a stop is one of law." (quotation omitted)). We reiterate our well-established rule that "it is not the role of this Court to reweigh the evidence or assess the credibility of witnesses; such decisions are left to the trial court as the trier of fact." Sweet v. St. Pierre, 2018 VT 122, ¶ 13, 209 Vt. 1, 201 A.3d 978.

right-of-way, a wide left turn resulting in crossing the fog line, and unusual operation of headlights during a turn signal. 2016 VT 105, ¶ 11, 203 Vt. 153, 154 A.3d 964. We said that "[r]egardless of whether any one of [the] defendant's 'missteps' actually amounted to a motor vehicle violation, the officer could have reasonably believed that there was a traffic violation or that [the] defendant was driving impaired." Id. ¶ 12. Furthermore, in Hayes, the officer did not tell the defendant he suspected her of being impaired even though the trial court found that basis to be sufficient.

¶ 20. And in State v. Bruno, we affirmed a traffic stop on suspicion of impaired driving where the officer observed the defendant swerving in the lane before briefly parking on a dead-end street and then operated the vehicle without headlights. 157 Vt. 6, 11, 595 A.2d 272, 275 (1991). We agreed "that these facts are sufficient to give rise to a reasonable and articulable suspicion on the part of the officer that the defendant was operating his motor vehicle while intoxicated." Id.

¶ 21. As we have said, it is important for courts not to take a "divide-and-conquer" approach when undertaking a totality-of-the-circumstances analysis. Manning, 2015 VT 124, ¶ 14 (quotation omitted); see also State v. Mara, 2009 VT 96A, ¶ 10, 186 Vt. 389, 987 A.2d 939 ("Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious, but to determine whether the totality of the circumstances justify the detention." (quoting State v. DeMarco, 952 P.2d 1276, 1282 (Kan. 1998))).

¶ 22. Consequently, while we do not disagree with the trial court's conclusion that the driver's wide left turn may be "insufficient" on its own to develop reasonable suspicion, we disagree that the finding was irrelevant in the context of the other factors the trial court found. Likewise, we disagree that defendants' entrance through a marked exit into the gas station forty minutes after the bars had closed in the area, the complete stop at the flashing yellow light, the brief activation of the high beams, and the wide left turn, when considered together, did not provide reasonable suspicion of impaired driving. Alone, any one of these events may not give rise to

9

reasonable suspicion. But the events did not occur in isolation; they occurred in a continuous stream of activity in a relatively short amount of time, all observed by the same police officer. See Hayes, 2016 VT 105, ¶ 12 ("In a relatively short period of time, the officer observed multiple indications of [the] defendant's lack of attention while operating [the] vehicle."). When considered in light of our case law, this is not a close case.[7] The trial court erred when it concluded that the totality of the circumstances did not provide LeClair with reasonable suspicion that defendants were driving while impaired. Accordingly, we do not reach the State's remaining arguments concerning whether a traffic violation provided the officer with reasonable suspicion to stop defendants.

Reversed and remanded for further proceedings.

FOR THE COURT:

_____
Associate Justice

¶ 23. **COHEN, J., dissenting.** I would affirm the trial court's decision to grant defendants' motion to suppress based on Officer LeClair's lack of reasonable suspicion, and therefore respectfully dissent. None of the alleged infractions individually create reasonable

---

[7] The dissent's suggestion that all of the operator's driving maneuvers were consistent with cautious driving, post, ¶ 50, misunderstands our standard of review in cases involving suspicion of DUI. See, e.g., State v. Davis, 2007 VT 71, ¶ 7, 182 Vt. 573, 933 A.2d 224 ("The totality-of-the-circumstances standard in reasonable suspicion determinations allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (quotation omitted)). Circumstances that appear harmless or safe on judicial review could have been indications of impairment to an officer at the time. Mara, 2009 VT 96A, ¶ 10. The recognition that law enforcement may draw on their experience and training is precisely the reason why "[c]ourts must avoid a divide-and-conquer analysis that scrutinizes each factor independently and accords no weight to conduct that alone is fairly innocuous." Manning, 2015 VT 124, ¶ 14 (quotation omitted).

suspicion of a traffic violation, and the totality of the circumstances does not amount to reasonable suspicion of driving under the influence (DUI).

## I. Facts and Procedural History

¶ 24. I begin by reciting the facts in detail because the majority fails to fully explain the testimony that the trial court found not credible and also fails to reflect the court's skepticism of the officer's decision-making. See State v. Marshall, 2010 VT 81, ¶ 17, 188 Vt. 640, 8 A.3d 1086 (mem.) (Skoglund, J., dissenting) (dissenting where "majority . . . gives undue credence to conflicting testimony that the trial court itself considered varying and uncertain and chose to ignore"); In re M.A., 2011 VT 9, ¶ 15, 189 Vt. 354, 22 A.3d 410 ("[C]redibility and weight are left to the sound discretion of the trial court.").

¶ 25. At roughly 1:30 a.m. on March 24, 2018, Newport Police Officer James LeClair stopped his car in a parking lot across from the Cumberland Farms convenience store in Newport to chat with Border Patrol Agent John Marquissee, who was parked there as well. Another Newport Police Department patrol car pulled in to join the conversation. A few minutes later, Officer LeClair, by watching through his rear-view mirror, noticed a car pull into the Cumberland Farms parking lot, and testified that the car entered through the area designated as the exit of the parking lot. The trial court noted that it was not provided with evidence related to the layout of the convenience store premises and was therefore unable to assess the significance of this observation.

¶ 26. Officer LeClair noticed the car circle the gas pumps, return to the pumps it had passed when it entered the lot, and then exit the parking lot and head south on Western Avenue towards the interstate access intersection. He testified, and the court found credible, that he could not see or identify the car's occupants; he also testified that he did not see whether the car's occupants pumped gas.

11

¶ 27.   When the car began driving south on Western Avenue, Officer LeClair followed. He testified that his suspicions were raised because the bars of Newport had recently closed for the night at 1:00 a.m. and because he observed the car entering through the exit and circling the parking lot.  Agent Marquissee followed behind Officer LeClair.  Agent Marquissee testified that it is common for border patrol agents to back up local law enforcement during late-night traffic stops.  The trial court asked him whether he followed Officer LeClair because he believed there would be a stop, and Agent Marquissee testified that he was not aware that there would be a stop. He stated that he did not know why he followed Officer LeClair at that time.  The trial court expressed concern in its decision over Agent Marquissee's "dubious response" to its line of questioning.

¶ 28.   As Officer LeClair followed the car, the car traveled slightly below the speed limit. He noted this both in his affidavit of probable cause and in his testimony.  He testified that he was suspicious of this behavior because he believed that people who are under the influence try to drive cautiously because they are impaired.  However, he had previously acknowledged that driving a few miles per hour under the speed limit is not a violation of the law and that drivers sometimes slow down when they see a law enforcement officer following them.  The trial court found that the car was travelling "in a consistent and appropriate speed relative to the changing speed limits along its route."

¶ 29.   While the car traveled down Western Avenue, Officer LeClair called dispatch to run the car's Massachusetts license plate to assess if the plates were valid and registered to that vehicle.  Dispatch later reported back that the car was registered to defendant Michael Sinquell-Gainey of Springfield, Massachusetts.

¶ 30.   Western Avenue's intersection with the interstate access road sits at the bottom of a hill with a traffic light; when the car reached the traffic light, the light was blinking yellow for travelers on Western Avenue and red for travelers on the access road.  In both his affidavit for

probable cause and his testimony, Officer LeClair noted that the car came to a complete stop at the intersection before turning left, but he also acknowledged that stopping at a flashing yellow light out of caution is not a violation of the law. The trial court found that the car stopped at the blinking yellow light.

¶ 31. During his testimony, Officer LeClair also alleged that the car activated its turn signal too close to the traffic light, in violation of the requirement that a car signal at least one hundred feet before the turn. See 23 V.S.A. § 1064(d). However, this allegation was not included in his affidavit for probable cause or his affidavit supporting the search warrant, nor was it stated at any other point prior to the hearing. The trial court found that Officer LeClair's testimony on this fact was credible, but it noted that there was no corroborating evidence of this alleged violation because the officer did not initiate a traffic stop at this point, and therefore his cruiser's thirty-second lookback feature did not record the incident.

¶ 32. Officer LeClair continued to follow the car, and he stated in his affidavit that the car took a wide turn onto the interstate access road, which took the car over the white line until the road became a two-lane road. In his testimony, however, he merely stated that the car swung wide and crossed what used to be a fog line. He further testified that the road had recently been repaved to open up the travel lane. The court again noted that the video evidence of this event was lost because Officer LeClair failed to initiate a traffic stop to turn on the dash-mounted camera in his cruiser. The court credited Officer LeClair's testimony that the car crossed the fog line, but it did not credit his statement in his affidavit that the car remained over the fog line for any appreciable amount of time.

¶ 33. The car continued up the access road and turned right onto the southbound lane of Interstate 91. Before this turn, the driver turned on the vehicle's high beams briefly and then turned on its right turn signal. Officer LeClair testified that these actions "piqued [his] suspicion even more to the possibility of being impaired."

13

¶ 34. Once the car was driving on the interstate, Officer LeClair asserted in his affidavit of probable cause that the car's left tires crossed the center line, and he testified that "the vehicle then veered across the dashed line, and his left two tires quickly corrected himself." Officer LeClair immediately turned on his blue lights to initiate a traffic stop. Accordingly, his cruiser's dash-mounted camera began recording. The thirty-second lookback feature recorded the car's left tires touching but not crossing the center line. The trial court noted the discrepancy between the video evidence and the officer's account, ultimately crediting the video's capture of the tires touching the center line, and found that Officer LeClair "did not note any other swerving or aberrant behavior." The trial court further noted that Officer LeClair was several miles out of his patrol area and continuing to travel farther away, which signaled that "some imperativeness to make a stop was in the officer's mind."

¶ 35. Both the car and Officer LeClair pulled over, and Agent Marquissee, who was still following right behind Officer LeClair, followed suit. Although both Officer LeClair and Agent Marquissee testified that Agent Marquissee stopped as a law enforcement gesture of courtesy to give Officer LeClair back-up, the trial court noted that "the video reflects a brief discussion between the officers taking place behind Officer LeClair's vehicle prior to both officers going to defendant's vehicle." As a result, the court found that Officer LeClair and Agent Marquissee coordinated before Officer LeClair interacted with the defendants.

¶ 36. Officer LeClair then approached the car's driver-side door. The cruiser video indicates that he told the driver,[8] defendant Sinquell-Gainey, that the car had swung wide over the white line during its turn left onto the access road from Western Avenue and that the car had also crossed the dashed line once it was on the interstate. He then asked defendant whether he had anything to drink that evening. Defendant denied drinking, and Officer LeClair did not make any

---

[8] Because defendant Sinquell-Gainey was driving the car at issue in this appeal, I refer to him as "defendant."

14

further inquiries into his sobriety. Officer LeClair did not ask defendant to get out of the vehicle or perform a field dexterity test, did not tell defendant that he smelled of alcohol, did not have defendant give a preliminary breath test, and did not call for a drug recognition expert. Officer LeClair further testified that defendant did not have slurred speech, bloodshot or watery eyes, or confusion when asked questions, which led him to believe that defendant was not under the influence. Although Officer LeClair testified that he told defendant that he stopped the car due to suspicion of impaired driving, the court noted that the video evidence showed that he did not actually state this during the stop.

¶ 37. Because this appeal relates solely to the assessment of Officer LeClair's reasonable suspicion during the events leading up to and in the initial inquiry stage of the traffic stop, it is unnecessary to recount the events that occurred after the initial stop. However, it is worth noting that the trial court expressed further doubts about the credibility of Officer LeClair's and Agent Marquissee's statements related to the resulting search of the car. This is in addition to the above-described credibility concerns related to the affidavit's unsupported assertion that the car remained over the fog line for an appreciable period of time, Officer LeClair's exaggeration about the degree to which the car crossed the center line, and Agent Marquissee's assertion that he was not aware there was going to be a traffic stop.

¶ 38. The trial court then assessed whether, based on these facts, Officer LeClair had reasonable suspicion to stop the car. It noted that Officer LeClair's testimony included "a veritable buffet of traffic violations" and other allegedly erratic driving behavior, including entering through the exit route of the Cumberland Farms gas station, circling the gas pumps in a suspicious way, stopping at a blinking yellow light at the intersection of Western Avenue and the interstate access road, failing to signal at least one-hundred feet before this same light, making a wide left turn and crossing the fog line, driving a few miles per hour under the speed limit, flashing its high beams and then turning on its turn signal when entering the interstate, and crossing the center line on the

15

interstate. Many of these alleged violations were included in Officer LeClair's affidavit of probable cause, but, notably, not the car's failure to signal at the blinking yellow light. The court further acknowledged that, although Officer LeClair testified that suspicion of the driver's impairment was his "main reason" for the stop, he did not investigate this suspicion after stopping the car and asking defendant if he had anything to drink.

¶ 39. The trial court next examined Vermont case law regarding reasonable suspicion of traffic violations and DUI. It noted that, in the context of DUI, a stop is valid if the officer had reasonable suspicion that either the driver committed a specific traffic violation or, under an assessment of the totality of the circumstances, that the driver was under the influence. State v. Howard, 2016 VT 49, ¶ 9, 202 Vt. 51, 147 A.3d 88. The court first assessed the totality of the circumstances, reviewing each purported example of suspicious driving and concluding that the circumstances did not give rise to reasonable suspicion of DUI. Next, the court considered whether Officer LeClair had reasonable suspicion of the three alleged traffic violations: the car's crossing of the interstate center line, turning too wide at the access road, and failing to signal. Of these three alleged infractions, the court found that only Officer LeClair's testimony regarding the failure-to-signal violation factually supported reasonable suspicion. However, it concluded that this violation was insufficient as a matter of law because only the objective grounds that were the stated purpose of the stop may establish reasonable suspicion, and this violation was not mentioned at any point other than the hearing.

¶ 40. The trial court's decision was infused with concern for the motivation behind the officer's actions, observing that "Officer LeClair had a conscious goal of stopping [defendant's] car" and that his "behavior in pursuing these mere hunches and suspicions gives the court pause. Where, as here, no objectively reasonable basis supports the stop, the question of pretext looms large." The court did not further address the issue of pretext but ultimately concluded that the

16

officer lacked reasonable suspicion to stop defendant and ordered the evidence produced through the stop inadmissible.

## II.  Analysis

¶ 41.    Motions to suppress "present mixed questions of fact and law, and we review the [trial] court's factual findings for clear error and its legal conclusions de novo." State v. Sole, 2009 VT 24, ¶ 17, 185 Vt. 504, 974 A.2d 587.  When findings of fact are challenged on appeal, "our role is limited to determining whether they are supported by credible evidence, while credibility and weight are left to the sound discretion of the trial court."  In re M.A., 2011 VT 9, ¶ 15 (quotation omitted).  "Trial courts are in a unique position to assess the credibility of witnesses.  It is not our role to second-guess a court's decision as to whom to believe; rather, our duty is to ensure that the court's findings are supported by the evidence." State v. Woolbert, 2007 VT 26, ¶ 9, 181 Vt. 619, 926 A.2d 626 (mem.) (citation omitted).

¶ 42.    As a threshold matter, the State argues that this Court should credit Officer LeClair's testimony over what the video shows.  The record supports the trial court's finding that the car touched rather than crossed the centerline.  The State is essentially asking us to re-weigh the evidence, including the repeated inconsistencies between Officer LeClair's assertions and the visual and audio evidence from Officer LeClair's own dash-mounted camera video, which we will not do.  The State has failed to show clear error.  See State v. Patten, 2018 VT 98, ¶ 4, 208 Vt. 312, 197 A.3d 873 (explaining that to prove clear error "appellant must show there is no credible evidence to support the finding" (quotation omitted)).  Because none of the other facts are in dispute, I now turn to the legal analysis.  Notably, the majority also does not find any clear error in the trial court's factual conclusions.

¶ 43.    "In DUI cases, evidence gathered from a stop may be admitted so long as the officer had a reasonable and articulable suspicion that the driver (1) committed a specified traffic violation, such as crossing the center line, or (2) that—based on the totality of the circumstances—

the driver was under the influence of alcohol." Howard, 2016 VT 49, ¶ 9. Reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996) (quotation omitted). Further, reasonable suspicion does not require a showing that a driver actually committed a violation before the officer stopped them; "[a]ll that is required is that the officer have a reasonable and articulable suspicion that the driver is engaged in criminal activity or has committed a traffic violation." Howard, 2016 VT 49, ¶ 5. This "level of suspicion . . . is considerably less than proof of wrongdoing by a preponderance of the evidence, but it must be more than an inchoate and unparticularized suspicion or hunch." State v. Sutphin, 159 Vt. 9, 11, 614 A.2d 792, 793 (1992) (citation omitted) (quotation omitted). As the United States Supreme Court explained, when law enforcement officers "act[] upon observed violations," such violations provide reasonable suspicion to justify a stop. United States v. Whren, 517 U.S. 806, 817-18 (1996) (quotation omitted).

A. Reasonable Suspicion of a Traffic Violation

¶ 44. The State argues that defendant committed traffic violations by (1) entering through the Cumberland Farms exit-only route, (2) failing to activate his turn signal at the intersection of Western Avenue and the interstate access road, (3) failing to stay in his lane while turning onto the access road, and (4) veering into another lane while traveling on the interstate. However, the trial court noted that Officer LeClair confirmed during the State's questioning that he observed defendant committing only two traffic violations: failing to keep to the right and failing to signal. Officer LeClair further answered "Yes" to the State's leading question, after listing the above two infractions and his other observations of allegedly impaired driving, that "none of these things in and of themselves, so far, are reason for a stop, but it's the culmination of those things" that led to him pulling over the car. Officer LeClair's testimony that no single infraction created justification

18

for a stop is inconsistent with the State's arguments in its brief that each individual alleged violation was sufficient.

¶ 45. In reviewing the record, I would not hold that any alleged infraction sufficient to create objectively reasonable suspicion. However, an in-depth analysis of each alleged infraction is not necessary here because the majority reverses solely on the totality of the circumstances analysis. Accordingly, I turn to consider whether the totality of the circumstances supported reasonable suspicion of impaired driving and conclude that it did not.

B. Totality of the Circumstances

¶ 46. As the majority notes, in engaging in a totality-of-the-circumstances analysis, "courts must avoid a divide-and-conquer" approach. State v. Manning, 2015 VT 124, ¶ 14, 200 Vt. 423, 132 A.3d 716 (quotation omitted); see also State v. Mara, 2009 VT 96A, ¶ 10, 186 Vt. 389, 987 A.2d 939 ("Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious, but to determine whether the totality of the circumstances justify the detention." (quotation omitted)). Further, the majority is correct that "there is no requirement that an officer, having reasonable suspicion of DUI, must also have cause to believe the operator has committed another offense." State v. Pratt, 2007 VT 68, ¶ 6, 182 Vt. 165, 932 A.2d 1039. "[R]easonable suspicion of driving while intoxicated is assessed by examining the totality of the circumstances and consequently may be supported by evidence of erratic driving, whether or not it amounts to a specific traffic violation." Id.

¶ 47. The majority concludes that the following facts supported reasonable suspicion of impaired driving: the bars closed at 1:00 a.m.; within an hour of the bars closing, defendant drove an out-of-state vehicle two to three miles per hour under the speed limit; defendant stopped at a flashing yellow light; defendant failed to put on his turn signal before turning left onto the interstate access road; defendant swung wide on his turn; defendant briefly flashed the car's high beams before using his turn signal; and defendant's left wheels touched the highway centerline. In my

view, these facts do not, as a whole, create an objectively reasonable suspicion of impaired driving. Pratt, 2007 VT 68, ¶ 6. As Justice Johnson wrote in her dissent in Pratt, "[w]hile otherwise innocent behavior might sometimes appear suspicious to a trained police observer, the standard for a constitutionally permissible stop of a vehicle nevertheless remains that of ordinary common experience." Id. ¶ 10 (Johnson, J., dissenting).

¶ 48. We have previously expressed concern over investigatory stops conducted without indicia of wrongdoing. In State v. Paro, we reversed the trial court's decision to deny the defendant's motion to suppress, ultimately holding that the totality of the circumstances did not provide the officer with a reasonable suspicion to stop the defendant's vehicle. 2012 VT 53, 192 Vt. 619, 54 A.3d 516 (mem.). The defendant was in her pickup truck idling at night in the parking lot of a business that had been burgled several times over the last thirteen years; when an officer began to turn towards the parking lot, the defendant pulled out of the lot. The officer pulled over the defendant solely due to his suspicion that she was engaged in criminal activity at the parking lot, and she was ultimately charged with DUI as a result of evidence obtained during the stop. She filed a motion to suppress, and the trial court denied the motion, concluding that the officer had a reasonable suspicion of criminal activity under a totality-of-the-circumstances analysis. Upon review, we noted that there were a number of plausible, innocent reasons why the defendant was idling in the parking lot, and we held that "[w]ithout additional indicia of wrongdoing," her actions should not have subjected her to a police seizure. Id. ¶ 12. While recognizing that "police officers are trained to be suspicious and it is their job to investigate suspicious situations[,] . . . we must also be mindful of our right to wander where we please, when we please, without fear of a police seizure." Id. ¶ 14.

¶ 49. This case is analogous to Paro and State v. Emilo, in which we reversed the trial court's denial of the defendant's motion to suppress, finding that the arresting officer did not have reasonable suspicion of wrongdoing to warrant pulling over the defendant's car. 144 Vt. 477, 479

20

A.2d 169 (1984). On his drive home from investigating a possible break-in at a retail store, the arresting officer observed a car on a gravel road known as Route 66 around 3:00 a.m. Having lived in the area for ten years and generally been familiar with the residences along the road, the arresting officer was not familiar with the car. The car was not speeding or being operated in a dangerous or unusual manner, but the officer observed that the car did not have a front license plate and had an out-of-state rear plate. He radioed the license plate number to the dispatcher and activated his blue light to pull over the car before hearing back from the dispatcher. Although it turned out that the defendant was indeed illegally driving the car without the permission of the car's owner, we held that the stop was unquestionably unlawful because the officer pulled over the car merely due to a hunch that the car was engaging in some form of wrongdoing, and the fruits of the stop therefore had to be suppressed. Id. at 482, 479 A.2d at 171.

¶ 50. As in Paro and Emilo, defendant's actions here were not dangerous or indicative of impaired decision-making; if anything, they speak to an abundance of caution while driving during the winter, at night, and out of state, and they do not amount to a reasonable suspicion of wrongdoing. Many of the facts the majority cites are equally consistent (or even more likely to be consistent) with careful driving, including driving under the speed limit and stopping at a flashing yellow light at an unfamiliar intersection. Other facts, such as defendant being on the road within an hour of the bars closing—with no accompanying evidence that defendant was coming from a bar—and flashing high beams before signaling a turn—either to intentionally brighten the road or because he made an innocent error when reaching for the turn signal level—are innocuous, commonplace acts that cannot support reasonable suspicion of DUI unless accompanied by other indicators of impairment. If factors like nervously driving under the speed limit or accidentally turning on a high beam (or windshield wipers or any other action that is controlled by the same levers) can weigh into a totality-of-the-circumstances analysis, that will contribute to

21

impermissibly intrusive searches and seizures by police and, as will be discussed below, discriminatory policing.

¶ 51. This case is further distinguishable from our precedent in State v. Pratt, in which we affirmed the trial court's denial of the defendant's motion to suppress. 2007 VT 68. In Pratt, the arresting officer turned on his dash-mounted camera after observing the defendant swerving within his lane on Interstate 89. The officer proceeded to follow the defendant's vehicle for several miles on the same stretch of highway, and the defendant continued to drift back and forth within his lane multiple times. Eventually, the officer stopped the defendant and asked him to perform field sobriety tests, during which the defendant's behavior suggested impairment. The officer arrested the driver on suspicion of DUI after the defendant refused a preliminary breath test, and a subsequent blood alcohol concentration test showed a result of .102. The defendant moved to suppress all evidence resulting from the stop. In determining that the officer had reasonable suspicion of DUI under a totality-of-the-circumstances analysis, this Court noted that the officer observed the defendant drifting back and forth multiple times over a distance of about five miles. Although intra-lane weaving was not in itself a traffic violation, the totality of the circumstances, including the physical extent and repetition of the weaving, supported the officer's reasonable suspicion of impaired driving. Id. ¶¶ 6, 8. Vitally, the trial court had found the officer's testimony to be credible and consistent with the dash-mounted camera footage. That is simply not comparable to the present case, in which the arresting officer both failed to turn on his dash-mounted camera until he initiated a stop and testified to events that the footage proved did not occur.

¶ 52. Although the majority here cites to the rationale in Pratt to support their position, they fail to appreciate the impropriety of placing such trust in officers' expertise under circumstances where the trial court repeatedly called into question the officer's credibility. Ante, ¶ 18. My colleagues' cited rationale about "rely[ing] on the expertise of the officer in recognizing

signs of impaired operation" cannot and should not be present in a case where the officer's credibility is demonstrably lacking.  Ante, ¶ 16; Pratt, 2007 VT 68, ¶ 6.

¶ 53.    This case is also distinguishable from our decisions in State v. Hayes, 2016 VT 105, 203 Vt. 153, 154 A.3d 964, and State v. Rutter, 2011 VT 13, 189 Vt. 574, 15 A.3d 132 (mem.).  In Hayes, the arresting officer testified to observing the defendant nearly hitting another car when failing to yield the right of way, as well as multiple indications that the defendant was not paying enough attention to drive safely, which we determined to sufficiently create reasonable suspicion of impaired driving when taken together even if none of the individual actions were traffic violations.  2016 VT 105, ¶ 11.  Conversely, in Rutter, the arresting officer heard the defendant's tires squeal and his engine rev as the defendant turned in an intersection.  We found those facts sufficient for the arresting officer to reasonably suspect that the defendant violated a statute prohibiting moving a vehicle without reasonable safety because the fact that the car's tires screeched when the driver proceeded from a stop where the road was dry and clear of snow and ice indicated that the car was not being driven with reasonable safety.  2011 VT 13, ¶ 10.

¶ 54.    Here, defendant did not engage in unsafe practices that tended to suggest impaired driving or another traffic violation.  As stated above, his actions are consistent with cautious driving, particularly considering that he was driving during the winter, at night, and out of state in a potentially unfamiliar area.  The totality of the circumstances here does not create a reasonable suspicion of impaired driving given our precedent.  To hold otherwise would leave the door open for law enforcement to follow any car they want to investigate in order to tally up the reasonable, non-dangerous driving errors that all drivers make.[9]

---

[9] Both defendant Michael Sinquell-Gainey and defendant David Vaz are Black.  The trial court found that there was no evidence that Officer LeClair knew defendants were Black prior to pulling the car over, but it acknowledged that Officer LeClair might have inferred defendants' race due to the Springfield, Massachusetts, address associated with the car's registration.  Although the trial court's factual findings indicate that race was not at issue in this case, it would be inappropriate to discuss arbitrary policing without mentioning its inherent connection to discriminatory police practices.

III.  Conclusion

¶ 55.    As the majority notes, "[i]n determining the legality of a stop, courts do not attempt to divine the arresting officer's actual subjective motivation for making the stop; rather, they consider from an objective standpoint whether, given all the circumstances, the officer had a reasonable and articulable suspicion of wrongdoing."  Zullo v. State, 2019 VT 1, ¶ 60, 209 Vt. 298, 205 A.3d 466 (quotation omitted).  While I share the trial court's concern about the officer's motivation for the stop, it is this objective standard that causes the State's arguments to fail.  Given the lack of objectively reasonable suspicion of any traffic violation or impaired driving under the totality of the circumstances, I would affirm the trial court's decision to grant defendants' motion to suppress.

¶ 56.    I am authorized to state that Chief Justice Reiber joins this dissent.

---

Associate Justice

**ON MOTION TO REARGUE**

¶ 57.    **PER CURIAM**.   Following this Court's opinion reversing the trial court's decision to suppress evidence in the underlying criminal case, defendants filed a motion to reargue.  A motion to reargue "must state with particularity the points of law or fact—presented in the briefs upon the original argument—that the moving party believes the Court has overlooked or misapprehended and that would probably affect the result."  V.R.A.P. 40(b)(1).  Defendants' motion alleges that this Court was improperly constituted and therefore the opinion should be withdrawn.  Defendants do not raise any point of law or fact presented in the briefing that was overlooked or misapprehended by this Court.  In fact, defendants do not make any argument at all related to the substance of this Court's decision.  Therefore, the motion to reargue is denied.

¶ 58.     In addition, defendants' motion does not otherwise provide a basis to invalidate this Court's opinion. The source of defendants' challenge stems from the fact that when this case was calendared and argued, Justice Robinson was a permanent member of the Court and participated in oral argument. Justice Robinson was subsequently appointed as a judge on the United States Court of Appeals for the Second Circuit, and at that time ceased her duties as a Vermont Supreme Court Justice, leaving a vacancy on the Court. The opinion was issued with the remaining four permanent Justices who sat for oral argument and retired Justice Dooley, who joined the Court as a substitute by special assignment. Defendants speculate that Justice Dooley was appointed to the case only after it became apparent that the remaining four permanent Justices were equally divided. They assert that such a "tiebreaker" assignment violates common law, the Vermont Constitution, and statute. Defendants claim that to remedy the error the opinion should be reissued without the vote from the substitute Justice, resulting in an affirmance of the decision below. Alternatively, defendants seek to have the case considered anew without the substitute Justice and with now-permanent Justice Waples.

¶ 59.     There is no basis to defendants' claim that the assignment of a retired Justice violated Vermont law. Defendants assert that there is a general (and Vermont) common-law principle that a judicial tie results in an affirmance. Defendants provide no Vermont law to support this assertion. Even accepting that there is such a general principle, it does not follow that this Court lacks authority to avoid a situation where a decision results in an evenly divided panel. Defendants have identified no Vermont case decided by an equally divided panel or endorsing such a process. In fact, to the contrary, our precedents recognize the long-established practice of making special assignments to the Court to avoid an evenly divided Court. See, e.g., Abbiati v. Buttura & Sons, 161 Vt. 314, 327, 639 A.2d 988, 995 (1994) (indicating that substitute Justice would be assigned where remaining four Justices were evenly divided); Wolfe v. Yudichak, 153 Vt. 235, 253 n.2, 571 A.2d 592, 602 n.2 (1989) (per curiam) (explaining that Supreme Court's

practice is to have "a full complement of [J]ustices" even when member is disqualified). This practice is well grounded in the Court's constitutional authority, which provides the Supreme Court with administrative control over the courts. Vt. Const. ch. II, § 30. It is also recognized by statute. 4 V.S.A. § 22(a)(1) (recognizing that Chief Justice can appoint and assign retired Justice to special assignment on Supreme Court). As this Court has previously explained, "the power to decide when to include former Justices in the composition of this Court is a judicial power that does not belong to the legislative branch of government and cannot be exercised by it." Wolfe, 153 Vt. at 254, 571 A.2d at 603.

¶ 60. Defendants seem to concede that a special assignment is constitutional and authorized if made before oral argument. Defendants' allegation in this case is that the special assignment, made after oral argument, was done to reach a certain result and therefore violated the Vermont Constitution's requirement that justice be "impartially administered." Vt. Const. ch. II, § 28. Defendants rely on a law review article, regarding state high-court tiebreakers, which reports that Vermont is among a group of states that appoint substitute Justices in advance of argument to avoid an evenly divided court, and that Vermont may also assign a substitute after argument to avoid a possible tie. D. Willett, Supreme Stalemates: Chalices, Jack-O'-Lanterns, and Other State High Court Tiebreakers, 169 U. Pa. L. Rev. 441, 484-85 (2021). The article reports that the assignment in Vermont is done administratively and does not involve factors related to the facts of the case. The article also states that in an interview with the author a judiciary employee described Vermont's process as "haphazard." Id. Although the article's portrayal is less than flattering, it accurately reports that assignment of substitutes is done on an administrative basis, without regard for the type of case. This Court holds high regard for the need to maintain impartiality in adjudication of its cases. There is simply no merit to defendants' suggestion that there was any partiality in the assignment of Justice Dooley. Like assignments in other cases, Justice Dooley was chosen as a substitute as part of an administrative process without involvement

by the permanent Justices. Moreover, he was appointed before he "made known [his] views." Wolfe, 153 Vt. at 255, 571 A.2d at 603. Therefore, there was no violation of Chapter II, § 28 of the Vermont Constitution.

¶ 61. To the extent defendants' filing can be construed as a motion to disqualify Justice Dooley because his partiality can be questioned, Justice Dooley has referred the matter to the rest of the panel and has not participated in this decision responding to the motion for reargument. The motion to disqualify is denied. See V.R.A.P. 27.1. As explained above, Justice Dooley was assigned before he expressed any view on the outcome of the case and acted impartially in deciding the case.

The motion to reargue is denied.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Karen R. Carroll, Associate Justice

_____
William D. Cohen, Associate Justice